WILLIAM GORDON ET AL., Appellants, *v*. URIAS J. LIVINGSTON, Respondent.

**May 30, 1882.**

1. To constitute actionable negligence, the person causing the injury must owe a duty to the person sustaining the loss.

2. Proof of usage will not supply the place of a contract where there is no contract.

3. A grain inspector's liability for a false certificate, given negligently but without fraud, does not extend to the purchaser of the grain who bought upon the faith of the certificate but with whom the inspector had not contracted.

4. The statute of 1864 imposed no duty upon a grain inspector to inspect grain leaving the elevators.

APPEAL from the St. Louis Circuit Court, BOYLE, J.

*Affirmed.*

GIVEN CAMPBELL, for the appellants : "If a person undertakes to do an act or discharge a duty, by which the conduct of others may properly be regulated and governed, he is bound to perform it in such manner that those who are rightfully led to a course of conduct, on the faith that the act or duty will be duly and properly performed, shall not suffer loss or injury by reason of his negligence." — Whart. on Neg., sect. 438 ; 1 Story on Bail., sect. 167 ; Chitty on Con. 415 ; *Pierson* v. *Prickett*, 15 Pick. 271, 272. See also *McKenna* v. *Bodine*, 6 Phila. 582 ; *Hays* v. *Porter*, 22 Me. 371 ; *Nickerson* v. *Thompson*, 33 Me. 433 ; *Tardos* v. *Bozant*, 1 La. An. 200 ; Cooley on Torts, 379–390, and notes. "In the case of one who holds out a certain profession, the law supposes him to be of competent skill, and he is responsible for any failure in that respect." — *Fish* v. *Kelly*, C. B. (N. S.) 205. "If the situation or profession of such person is such as to imply skill, an omission of that skill is imputable to him as gross negligence."— *Shields* v. *Blackburne*, 1 H. Black, 162. A

notary public who is employed to protest a foreign bill of exchange, is liable to any person injured by his neglect in so doing. He is liable directly to any one for whose benefit he is employed, and not solely to his immediate employer.— Shear. & Redf. on Neg., sects. 425–243; *Fogerty* v. *Finley*, 10 Cal. 239; *Hover* v. *Barkhoff*, 44 N. Y. 113. Where one holds himself out to the public as a physician and surgeon, the law implies a promise and a duty on his part, that he will use reasonable skill and diligence in the treatment and for the cure of those who employ him, and he is liable to a person injured, although the contract for the service was made with a friend of the injured man.— *Gladwell* v. *Steggall*, 5 Bing. N. C. 733; *Pippin* v. *Sheppard*, 11 Price, 400.

MARSHALL & BARCLAY, for the respondent: The plaintiff cannot retain the property and afterwards sue for damages on account of inferior quality, unless there be a warranty or deceit. — *Sprague* v. *Blake*, 20 Wend. 64; *Reed* v. *Randall*, 29 N. Y. 358; *McCormick* v. *Sarson*, 45 N. Y. 265. Having failed to exercise reasonable care, plaintiffs cannot recover, if the case is to be governed by the rules applicable to all questions of negligence. — *Nolan* v. *Shickle*, 69 Mo. 336; *Schaabs* v. *Wheel. Co.*, 56 Mo. 173. The evidence shows that the Empire Mill Company mixed this grain from various grades for the purpose of sale, leaving defendant under the impression that it came out of a repository exclusively for No. 1 wheat. On such facts, it is plain that the Mill Company could never recover of defendant. How, then, could its vendee? — *Bank* v. *Sells*, 3 Mo. App. 85. There is no " causal connection " between the assumed negligence of defendant and the injury to plaintiffs. The intervention of an independent agency (the Mill Company) between the plaintiffs and the act of defendant breaks the connection necessary to any recovery for negligence. The case at bar is not different in principle from many groups of facts where recovery has been denied for the same

reason. They are mentioned in the authorities. — Whart. on Neg., sects. 439, 440; *Id.*, sect. 134, and cases cited; Rev. Stats. Mo., sect. 3462; *Dormitzer* v. *Greve*, 3 Mo. App. 593; *Cunningham* v. *Railroad Co.*, 51 Texas, 503. A recovery was denied in one instance on a state of facts involving this principle, but presenting stronger merits for recovery than appear in the case at bar. — *Bank* v. *Ward*, 10 Otto, 195. No one can be held guilty of negligence for a mere error of judgment. — *Reed* v. *Conway*, 20 Mo. 22; *Dodd* v. *Williams*, 3 Mo. App. 282.

BAKEWELL, J., delivered the opinion of the court.

This is an action for damages caused to plaintiffs by the negligent act of defendant as a grain inspector in the city of St. Louis, in issuing to the Empire Mill Company a certificate that a certain lot of wheat was No. 1 red winter wheat, which, in fact, was wheat of an inferior grade. The claim is that plaintiffs paid for the wheat, of which there were twenty thousand bushels, on the faith of the certificate, at the rate of ninety-one cents a bushel, and that it turned out to be an inferior grade, of less value. The answer was a general denial.

At the close of the plaintiffs' case the court instructed the jury that there was no evidence to warrant a recovery; and there was a verdict and judgment accordingly.

It is not necessary to set out more fully the allegations of the petition. No *scienter* is alleged or proved. There was no attempt to show fraud or collusion. The theory of plaintiffs, announced at the trial, is that the action is not an action for deceit, but strictly an action for negligence.

Our attention is called by appellants to the provisions of an act entitled "An act to amend an act to incorporate the Union Merchants' Exchange of St. Louis." This act was approved February 2, 1865. Sess. Acts 1864, p. 260. It does not appear that attention was specially called to this

enactment on the trial.    But, as the act is declared a public act, both the trial court and this court take notice of it. It provides that the Union Merchants' Exchange shall have power to appoint a board of grain inspectors, whose duty it shall be to inspect all grain that shall be stored in bulk in any elevator erected in the city of St. Louis ; that the exchange shall, at least once a year, establish standard grades of the various kinds of grain, by which the inspectors shall be governed ; that the exchange shall fix the compensation to be paid to said inspectors for all grain inspected by them ; and that, all grain which shall be stored in any elevator in the city of St. Louis shall, before being placed in the elevator, be inspected by said board of inspectors ; and their decision shall be final as to the quality and grade of said grain.

The inspection complained of in the present instance was made by defendant on September 25, 1878.    The testimony is, that at that time there was no board of inspectors of the Merchants' Exchange of St. Louis ; nor had there been such a board.    The defendant was appointed grain inspector by the board of directors of the Merchants' Exchange, on July 1, 1870, and acted as chief inspector from that date until a time subsequent to the giving of the certificate in the present case.    He had deputies under him, and gave certificates on their inspection, as well as when he made inspection himself.    These certificates were regarded by grain merchants as evidence of the grade of grain.    This was the general custom of the trade ; and it was well known to defendant that his certificate was considered evidence that the grain was of the grade named in it.    The certificate, by the recognized custom of the trade, accompanied the draft sent to the purchaser of grain, and he usually accepted and paid the draft without inspecting the grain, on the faith of this certificate.    Defendant inspected about two-thirds of the bulk wheat coming to St. Louis.    In the present case, according to the usual custom, defendant was paid for the in-

spection by the seller, at the rate of fifty cents a thousand bushels.

The grades of wheat are fixed by periodical resolutions of the board of the Merchants' Exchange. On June 3, 1878, a change of grade was made by the board, to take effect on the 1st of August. What had been No. 2 wheat was classed as No. 1. There were then three grades of wheat. No. 1 was all sound, well cleaned, dry red, or red and white mixed winter wheat. No. 2 was all sound, dry, reasonably clean red, or red and white mixed winter wheat. No. 3 was all sound, dry, red, or red and white, mixed, thin, or bleached, winter wheat. The object of appointing an inspector is to classify all grain that comes to St. Louis, in order to have uniformity of grade. If left to the owner, every man would fix the grade of his wheat as high as he possibly could. The grain is first inspected by the regular inspector, before it goes into the elevator, and the bins are marked for the separate grades ; each grade going into its own bin. Early in the season a high grade of No. 2 wheat may be hard to distinguish from a low grade of No. 1. A mixture of very good No. 1 with very good No. 2 wheat might, if the proportion of the No. 2 was not too great, make a fair No. 1 wheat.

The Empire Mills Company had sold to Gordon & Gormilla, of New Orleans, twenty thousand bushels of wheat which it was to load into a barge at the elevator for the purchaser. The Empire Mills Company sent warehouse-receipts to the elevator company, with directions to load the barge with one-third No. 2 wheat, and two-thirds No. 1. This was on September 25th ; and, as the quality of each grade was superior, the Empire Mills Company thought that the mixture would make what, after the bulk of the wheat began to come in, would be a fair quality of No. 1 wheat. The company directed the secretary of the elevator company to say nothing about this to the inspector ; but if he objected to the quality of the mixture to stop the

No. 2 wheat and run in nothing but No. 1. The wheat was inspected by Livingston and his deputies, in the usual way, as it was running from the bottom of the elevator to the top, before going into the barge ; and defendant gave his certificate in the usual form as follows : " Office of Grain Inspector, room 207, Chamber of Commerce, September 25, 1878. This certifies that I have inspected for account of Empire Mills Company, out of Central ' B ' Elevator, into barge A. J. Baker, No. 15, twenty thousand bushels No. 1 red winter wheat. W. J. Livingston, Inspector, per J. P. Smith, deputy."

This wheat was sold on arrival at New Orleans, by Gordon & Gormilla, to persons who were to ship it to Europe. After a part of it had been transferred from the barge to the other bottoms, it was found by inspectors and experts in New Orleans to be No. 2 wheat, worth from two to three cents a bushel less than No. 1 wheat. Evidence was offered and excluded, that in consequence of the wheat not coming up to the standard, Gordon & Gormilla were compelled by suit to pay to their vendees $2,000 and costs of a protracted litigation. Gordon & Gormilla paid the draft which accompanied the inspector's certificate, on the faith of that certificate, and without examining the wheat.

It will be observed that the law provides for an inspection of wheat before it enters the elevator. Nothing is said in the act to which we are referred about inspection for the seller when the wheat leaves the elevator. Nor does the act provide for the appointment of an inspector of grain, but for a board of grain inspectors.

" It is not every one," says Chief Justice Bearley, in *Kahl* v. *Love* (37 N. J. L. 8), " who suffers a loss from the negligence of another, that can maintain a suit on that ground. The limit of the doctrine relating to actionable negligence is, that the person occasioning the loss must owe a duty, arising from contract or otherwise, to the person sustaining such loss. Such a restriction on the right to sue

for a want of care in the exercise of employments or the transactions of business, is plainly necessary to restrain the remedy from being pushed to an impracticable extreme. There would be no bounds of actions and litigious intricacies, if the ill effects of the negligences of men could be followed down the chain of results to the final effect. Under such a doctrine, the careless manufacturer of iron might be held responsible for the destruction of a steamer by the bursting of a boiler, into which his imperfect material, after passing through many hands and various transformations, had been converted. To avoid such absurd consequences, the right of suit for such a cause has been circumscribed within the bounds already defined." Accordingly, it was held in that case that the certificate of a tax collector is used to show that the property is freed from the tax, at the peril of those who rely upon it, and that no action lay against the collector for a false certificate in favor of a purchaser who had relied upon the receipt as showing that the property was discharged of the tax; and it was further held, that the position was not changed by the knowledge of the collector that his receipts were sometimes used as certificates that the property was clear from taxes. The collector was bound to transact the public business with care, and a failure to do so by giving a receipt for taxes which were not paid, was a breach of contract. But this contract was with the public, and an individual could not complain of the breach of it.

One who sells a defective article to be used for a particular purpose for which it is not fit, is not, in the absence of fraud, liable for an injury caused to a third person by some defect in the construction of the article. *Langmeid* v. *Holliday*, 6 Exch. 761. Nor is the artisan who carelessly hangs a chandelier in a public house, knowing that it is liable to fall and injure the person frequenting the house, if not properly hung, liable to a guest of the house upon whom it falls. *Collis* v. *Selden*, L. R. 3 C. P. 495.

Nor, where there is no fraud or collusion, is an attorney liable to a person who did not employ him, for an erroneous certificate of title, relying upon which the stranger to the attorney buys the property, and suffers loss by failure of title. *Savings Bank* v. *Ward*, 10 Otto, 195.

In this last case, and in *Kahl* v. *Love* (*supra*), the leading cases in England and America are cited and commented upon.

No case can be cited in support of the proposition that persons not employing an agent can have a remedy against him for the careless performance of an act, where the wrongful act was not immediately dangerous to the lives of others. An action will lie against a surgeon for malpractice, by the party injured, though the surgeon was employed by a friend ; or against an apothecary who sells a deadly drug with a wrong label, though the package passes through many intermediate hands before it reaches the person injured by it. But the liability arises there from the duty which the law imposes to avoid acts in their nature dangerous to life ; and these cases form a class apart.

Where there is fraud, and damage as a result of the fraud, not from a remote and consequential act, but from one contemplated by the defendant at the time, — as, where defendant sold a dangerous gun to a father, for the use of his son, with a fraudulent warranty that it was good and safe, and the son was injured by its bursting, which was the case in *Langridge* v. *Levy* (2 Mee. & W. 519). But every imputation of fraud and collusion is disclaimed in the case at bar.

There was no contract with plaintiff by defendant shown, and where there is no contract, proof of usage will not make one, as is said by Judge Clifford in *Savings Bank* v. *Ward* (*supra*).

It is contended, however, that defendant, in issuing this certificate, was in the performance of a public duty. We see no evidence that he was a public officer appointed by

law to certify to the grade of wheat going out of the elevator.

Take it that defendant was a public officer. His duty is not shown to have extended beyond this, even if it went so far, — that he was to give certificates on inspection, of the grade of wheat, to those who applied to him to do so, and paid him for doing so.

The recorder of deeds in Pennsylvania is a public officer giving bond. His duties are larger than those of the like officer with us. He is bound by law to make searches for deeds and mortgages at the instance of those who apply therefor and pay him the fee allowed by law, and it is held that he is liable on his bond for a false certificate that there is no mortgage. *McLaraher* v. *The Commonwealth*, 5 Watts & S. 21. But it is also held that the liability for a false certificate of search only extends to the party taking the certificate, and gives no action against the recorder to a purchaser who did not contract with the recorder, but who relied upon his certificate and was deceived. *The Commonwealth to use* v. *Harmer*, 6 Phila. 90 ; *Houseman* v. *Girard, etc., Assn.*, 81 Penn. 256.

*The Commonwealth* v. *Harmer* (*supra*), is very much in point. It appeared that the custom is, that each subsequent purchaser takes upon the faith of the former certificates of search, and that the certificate has all the force of evidence in the hands of subsequent purchasers that it had in those of the first ; and that these certificates are usually correct, and generally relied upon, being made under official responsibility. "But," says Agnew, in delivering the opinion of the court, "the duty is specific, to make it for him who asks it and pays for it, and therefore has a right to the responsibility of the officer, and to rely upon it. It is he who is deceived by the officer's false search, because he alone stands in privity with him, by demanding performance of the duty, and making compensation for it. The emoluments of the office constitute the consideration of undertak-

ing the responsibility.   *   *   *   To make him responsible to every new purchaser, without a fee, would be as inequitable as to hold an insurer liable on a new risk without a new premium.''

We think the judgment of the circurt court ought to be affirmed.   It is so ordered.   All the judges concur.