MARJORIE BRAGG v. THE OHIO CHEMICAL & MANUFACTURING COMPANY, a Corporation, and MIDVALE DENTAL SUPPLY COMPANY, a Corporation, Appellants.—162 S. W. (2d) 832.

Division Two, December 16, 1941.

Rehearing Denied, May 5, 1942.

Motion to Transfer to Banc Denied, June 17, 1942.

*Clark, Boggs, Peterson & Becker, Howard B. Lang, Jr.,* and *Barnes & Barnes* for appellants.

*Anderson, Gilbert, Wolfort, Allen & Bierman* for respondent.

580

 ELLISON, J.—The original opinion in this case was written by BOHLING, C. We granted a rehearing because we feared we misunderstood the workings of the machine involved. The case was reargued and assigned to the writer who prepared an opinion which was adopted. Both of these opinions reversed the judgment for respondent. Now on second rehearing, she urges that we still fail to comprehend the workings of the machine, and that seems to be true. Appellants have filed a motion to strike out, respondent's second motion for rehearing under Rule 21 of this court, which provides that no second motion for rehearing by the same party will be entertained. But in the interest of justice and in order that the facts may be correctly stated, we have decided to reexamine the case. The statement of facts is taken largely from the opinion of BOHLING, C., without quotation marks.

Marjorie Bragg recovered a $10,000 judgment against The Ohio Chemical & Manufacturing Company, an Ohio corporation authorized to do business in Missouri, and Midvale Dental Supply Company, a Missouri corporation, for the death of Minter K. Bragg, her husband. Minter K. Bragg was a dentist engaged in the practice of his profession at Mexico, Missouri, under the firm name of K. R. Bragg & Son. The Ohio Chemical & Manufacturing Company is the manufacturer of and the Midvale Dental Supply Company is a dealer in a machine known as the Ohio Analgesor, used for the administration of nitrous oxide gas, sometimes called "laughing gas," to produce analgesia or an absence of sensibility to pain. The record establishes that it is common knowledge within the dental profession that nitrous oxide gas in uncontrolled quantities produces death. Dr. Bragg's lifeless body was found seated in his dental chair on June 16, 1937, with the nasal attachment of an analgesor over his nose. Issues involving the submissibility of plaintiff's case, the competency of certain testimony, and the propriety of giving and refusing certain instructions are presented.

Respondent's petition did not predicate negligence on a defectively constructed analgesor but on negligent representations of what the analgesor would do "when the appellants knew, or by the exercise of ordinary care could have known" that the analgesor was not so constructed that it would function safely as represented. It alleged appellants represented that "said device could be safely used by her said husband upon his own person for experimental or other purposes;" that her "husband by reason of and in reliance upon the representations . . . undertook to use and did use said device . . . upon his own person in the way and manner prescribed and directed by the defendants; and that said machine, when so used by her said husband, caused and permitted a large and uncontrolled

amount of nitrous oxide gas to suddenly enter his lungs and to thereby cause his instant death,'' et cetera.

The analgesor was operated by compressed air. Its construction and operation are outlined hereinafter. Respondent's brief points out there was evidence that if the compressed air did not escape through an air vent nitrous oxide gas would continue to flow until the supply was exhausted. He says: ''A particle of dust could clog it (the air vent) and make the flow of gas uncontrollable.'' ''If a little piece of dust or other particle were lodged in the pinhole vent, that might cause the machine to fail to function. 'That might have been blown out when the machine was next operated and the functioning would then proceed in a normal manner.'' With the foregoing in mind much of the testimony adduced at the trial may be eliminated as having no bearing upon the ultimate factual issues of a submissible case.

The analgesors were not sold on approval but only after the doctor had been given a demonstration by one of the Ohio company's representatives and found that the machine did the work and had a place in dentistry alongside novocaine anaesthesia. Mr. Stehlin, a representative of the Ohio company, called at the office of K. R. Bragg & Son. He explained and demonstrated the analgesor, first, on Minter K. Bragg, the deceased, and then on K. R. Bragg, who was present. K. R. Bragg testified: ''Q. Did you do it just like your son, Minter, took it? A. Just like it said to take it, with the bulb, and after you get a certain amount you just voluntarily quit taking it . . . Q. Could you squeeze it (the bulb) any more if you wanted to? A. I don't think you could. . . . Q. Now, I wish you would tell the jury the conversation that Mr. Stehlin and your son, Minter, had about the use of this machine on Minter himself for experimental purposes. Just go ahead.''

The witness continued: ''Minter asked him if he could use it safely on himself, absolutely safely, and if it would be safe to use it on himself; that he said it certainly would, absolutely safe. Q. Who said that? Stehlin said that to Minter? A. Yes. Q. Go ahead and tell what else was said. A. And after that I just made the remark, I says, 'I wouldn't be surprised if anyone in the habit of taking a dram, dentist in the habit of taking a dram, before they go out on rainy days, or if they are busy, in place of going out they get in the chair and do that.' And he said, 'Yes, a whole lot of dentists did that.' Q. Who said that? A. Mr. Stehlin. Q. He said a whole lote of dentists did that? A. Yes. Q. What else was said? A. I just made the remark, 'Minter wouldn't do that because he never drinks.' And Minter said, 'No, I wouldn't but I would like to—I would like to experiment with it on—before using it, would like to experiment with the machine before using it on the patients.' Q. Experiment

how? A. What is that? Q. You mean experiment on himself? A. Yes. And Stehlin said that was perfectly all right for him to do it, it would be perfectly safe.''

Mr. Stehlin left advertising matter with the Drs. Bragg. We quote from it, italicizing two or three statements:

''In analgesia there is no loss of any sensation except that of pain. The patient continually breathes air, but adds Nitrous Oxid by compressing the bulb whenever pain is anticipated. *The danger of breathing an excessive amount is eliminated; if the patient ceases to compress the bulb, the flow of gas promptly stops* and pure air is again breathed.''

''The bulb should not be compressed too vigorously, as that will cause the breathing bag to gradually inflate and the patient will temporarily breathe too much Nitrous Oxid resulting in an uneven Analgesia. Remember that a patient will sometimes continue to compress the bulb and drowse off into a light, pleasant sleep. This is not Anesthesia as otherwise the patient would lose muscular control and cease to compress the bulb. If a patient drowses off in this manner, it is simply an indication that the flow of gas should be decreased at the control valve.''

''Leaks of air will sometimes occur through the exhaling valve due to the disc becoming stuck in the open position. This may occur due to a chip of soap or other foreign matter lodging in the valve. The remedy is to unscrew the top of the exhaling valve, being careful not to lose the wire spring, dry out the valve and re-assemble properly. Occasionally when inhaling, patients will suck in so much air through leaks that the Nitrous Oxid will accumulate and inflate the bag. If the bag is deflated with each inhalation, it is an indication that the equipment is being operated correctly. . . .''

''Occasionally, unsatisfactory analgesia has been due to failure to properly open the valve of the cylinder. If the valve stem is turned only slightly, the flow will naturally be restricted. Ohio valves should be opened all the way to permit unrestricted flow and eliminate leakage through the packing.''

''Watch the manner in which the patient presses the bulb. If the patient is energetic it may be desired to turn the measuring device so that the pointer will be closed to the word 'off.' On the other hand, if the patient is receiving insufficient Nitrous Oxid, turn the pointer closer to the word 'heavy.' ''

''Caution: The patient should continually breathe some air and only sufficient Nitrous Oxid should be added to produce analgesia. Instruct the patient to compress the bulb in rhythm with each inhalation when pain is felt. If this does not produce analgesia turn the

arrow on the measuring device so that more gas is delivered with each compression of the bulb.''

In introducing the patient to the subject of Analgesia, one important authority ''asks the patient to put the nasal inhaler in position and to take hold of the bulb and mentions that only air will be breathed unless the bulb is compressed and then a little Nitrous Oxid will be added. He sometimes *leaves the room for a few minutes,* permitting the patient to play with the bulb, and on his return he usually finds her unafraid and interested in the equipment.''

''*Safety* and enjoyment of Analgesia depend upon the patient operating the bulb. Dentists or their assistants should not squeeze the bulb for the patient, as it is impractical to produce a smooth, pleasant Analgesia in that manner and *a bad form of* Analgesia *or Anesthesia* may result. *Do not attempt to use the equipment to produce ANESTHESIA.* It is designed only for ANALGESIA.''

The analgesor consisted of a portable stand with a commercial cylinder of nitrous oxide gas under pressure mounted thereon. The gas was conducted through a reduction chamber in which the working pressure could be regulated by a hand screw, as desired. Thence it passed through a ''control valve'' and on through a hose which led to a mask placed over the patient's nose. This we may call the *gas* line. Attached to the control valve was another rubber tube with a rubber hand bulb on the other end. This may be called the *air* line. The bulb was placed in the patient's hand. The gas was self-administered by the patient, by squeezing the rubber bulb. The air in the bulb and tube was thereby compressed, and that pressure transmitted to and exerted against a diaphram in the control valve, forcing open a spring valve ▆ and permitting the gas to flow into an elastic rubber bladder in the gas line and on to the patient's nose where it was inhaled.

There was a check valve in the coupling between the hand bulb and attached tube in the air line, which prevented backflow of the air pressure through the air line when the patient's grasp of the bulb was relaxed and the latter permitted to expand again. Thus the air pressure was locked in the air line and against the diaphram in the control valve, holding it open so the gas would continue to flow through the gas line indefinitely. To prevent this a very small vent was drilled into the control valve through which the compressed air could ooze out into the atmosphere, in time restoring the internal air pressure to normal. The diaphram and spring in the control valve would then return to their free positions and close the control valve, cutting off the flow of gas. But if the air vent was stopped up by dust or other foreign matter, or if the spring valve was stuck in the open

position, the gas would continue to flow. We here show a photograph of the analgesor.

The offices of Dr. Bragg were located on the second floor of a business building, had a private and public entrance and were divided into five compartments, or rooms and a vestibule. Minter K. Bragg used the machine a few times, at least twice, and was very elated over it. K. R. Bragg testified that on June 15, 1937, he left the office at 5:30 P. M.; that his son was then in the X-Ray room, cleaning with a

mop; that the latter had locked the public entrance; that the witness went out through the private entrance which locked behind him, went downstairs and locked the hall door because Minter never wanted to be disturbed after business hours, and that all the office windows had been closed and the doors locked when he departed. There was testimony that this was a very warm June day.

Mrs. Minter K. Bragg, widow of the deceased, testified that he was interested in experimentation. He would become engrossed in it and remain at his office, forgetting about his meals. In temperament he was optimistic, of cheerful disposition and in good health. On the evening of his death the witness called him about 5:45 P. M. He said he would probably remain in his office until 7 P. M., and laughed. Mrs. Bragg retired before her husband came home. She awakened about 1:30 A. M. and he still was not there. So she called his father.

The father, K. R. Bragg, in company with officer McIntyre and Robert Sims, a taxi driver, immediately went to the offices and found Dr. Minter K. Bragg's body in his dental chair, with the analgesor nearby, its nasal mask over his nose and the hand bulb under his hand. K. R. Bragg testified: "Just as soon as I saw him in the chair and I saw this on his nose, I took this off his nose and knocked the bulb out of his hand and commenced to pat him and try to see if I couldn't bring him to;" that Minter had the bulb in his hand; that he hit Minter's hand hard enough to knock the bulb loose if it were loose, but on cross-examination refused to swear that the bulb was attached to the air tube and stated he did not want to be understood as swearing it was attached. Witnesses McIntyre and Sims, who followed K. R. Bragg into the room, testified when they saw the bulb it was on the floor and not attached.

Dr. J. F. Harrison testified he arrived at the Bragg office about 2:00 A. M.; and that, in his opinion, Minter K. Bragg had been dead for six or eight hours. When discovered Minter K. Bragg's body was rigid; his arms were on the armrests of the dental chair, with the fingers extended straight out and palms down. There was testimony that rigor mortis sets in anywhere from thirty minutes to two hours and that decedent's body was extremely rigid. B. M. Marlow, the coroner, testified he was notified and arrived at the Bragg office about 2:15 A. M. The windows were open and the dials of the analgesor were at zero, indicating the gas cylinder was empty. He ordered the body removed, but no autopsy was performed later. However there were red spots on the corpse; such as would be produced by a lethal overdose of nitrous oxide gas. When the coroner took charge he locked the office and let nobody in. That afternoon he called D. T. Moore, a dentist, who brought a tank of nitrous oxide gas, and they tested the analgesor. Dr. Moore and Mr. Marlow each testified the gas tank or cylinder was empty. Dr. Moore attached the tank of gas he brought, and the machine worked perfectly.

 Appellants stood on a demurrer to respondent's evidence. Respondent does not contend that appellants were insurers, that the analgesor was tinker-proof, or that it could not produce death. Respondent's theory, nisi as well as here, is that Minter K. Bragg, at the time of his death, was using the analgesor upon himself for experimental purposes in a manner complying with the representations of the demonstrator, Mr. Stehlin, and the advertising literature; and that the machine failed to work. She speculates that the air vent may have become clogged by a particle of dust thereby permitting the flow of an uncontrolled quantity of nitrous oxide gas. There is no direct evidence that deceased was using the analgesor in the manner directed by the appellants or that the air vent became clogged.

There is substantial evidence that Dr. Minter Bragg's death was caused by nitrous oxide poisoning self-administered through the analgesor, but no direct evidence as to why it released a lethal overdose of the gas. We can think of only four possible reasons. If the deceased had a suicidal intent, or was engaging in rash experimentation, possibly he could have intentionally squeezed the bulb rapidly a great number of times before the paralyzing effect of the gas set in, and thereby built up such high pressure in the air line and control valve that the air could not escape through the tiny air vent in time to close the valve and stop the flow of gas before he had been asphyxiated. But we think these theories are less probable than two others presented to be mentioned. The suicide theory runs counter to the presumption against suicide in the absence of convincing circumstantial evidence to the contrary. [20 Am. Jur., sec. 220, p. 216; 22 C. J., sec. 35, p. 96; Brunswick v. Standard Acc. Ins. Co., 278 Mo. 154, 213 S. W. 45, 7 A. L. R. 1213.] And the experimentation theory (with qualifications to be discussed later) is against the presumption of due care on the part of a deceased person in the absence of evidence to the contrary. [State ex rel. Alton Rd. Co. v. Shain, 346 Mo. 681, 692 (9), 143 S. W. (2d) 233, 239 (13).]

The strongest fact against both these theories is that when the deceased was found the gas tank was empty. It had contained 250 gallons of nitrous oxide gas five days before when received, and had been used only two or three times. There is no testimony as to how much gas would normally be required for each patient, but in view of the fact that only one cylinder of gas was furnished with the machine, it seems to us a fair assumption that with so little previous use the tank could not have been emptied by Dr. Minter Bragg in the self-administration of the gas; and that it must have resulted from something which kept the valve open indefinitely. There might be a possibility that if the deceased had increased the gas *pressure* in the reduction chamber it would have discharged more gas in a given length of time; but there is no evidence that he did do that, and the testimony of Dr. Moore is that the analgesor worked perfectly when

he tested it the next afternoon. It would be visionary to speculate that he first released most of the gas from the cylinder into the closed room, and then exhausted the rest of it by inhalation after assuming the position in the dental chair in which he was found.

One of the two other ways in which the death might have been caused is that suggested by respondent's counsel in her brief: namely, that dust or similar foreign matter lodged in the tiny air vent and prevented the escape of air therethrough, in consequence of which the control valve remained open permitting gas to flow until and after the doctor died; and that the dust particle was dislodged or blown out when Dr. Moore made his test next day. But there is no evidence that this had ever occurred before in any analgesor; and none as to the gas pressure in the cylinder of gas Dr. Moore and Mr. Marlow used in their test. Another way in which the casualty might have occurred is that the diaphram or spring valve in the control valve might have stuck in the open position, permitting the gas to flow without stoppage. The manufacturer's literature left with the Drs. Bragg warned them that another valve (in the hose mask) called the exhaling valve, might become stuck in the open position.

But granting the death was produced in either of these two ways the appellants would still be liable—if respondent's view of the case be correct. She frankly indulges in conjecture as to the producing cause of the death, but maintains appellant's representations, oral and written, amounted to a blanket assurance that whatever did happen would not occur. Summed up, the representations on which she relies are the statement of the demonstrator, Mr. Stehlin, that it would be *"absolutely safe"* for Dr. Minter Bragg to experiment on himself with the analgesor; and the statement in the advertising literature that the danger of breathing an excess amount of the gas was eliminated because the flow of gas would promptly stop if the patient ceased to press the hand bulb; and that the patient necessarily would discontinue that operation because the effect of the gas would render him incapable of doing it.

Most actions of this kind, against manufacturers especially, are brought on implied warranties. Many of the decisions cited by appellants are of that class. But this one is not: it sounds in tort for negligence in making the above express representations, when the appellants knew or should have known the analgesor could not be safely used for self-experiment. The theory of respondent is, of course that the deceased, her husband, relied on the representations. Such causes of action are recognized in Sec. 311, Restatement of the Law of Torts; and it is there said the liability arises if the representer, though believing the representations to be accurate, failed to exercise reasonable care to ascertain their accuracy or was negligent in phrasing them and thereby induced the action of the injured party. Obviously the rule further contemplates that such action by the injured party must

come reasonably within the scope of the representations made, and the event must be such as the representer in the exercise of reasonable care was bound to anticipate might occur.

The representation of Mr. Stehlin was that Dr. Minter Bragg could with absolute safety use the machine in experimenting on himself. The first definition of "experiment" is (italics ours): "a trial or special observation made to confirm or disprove something doubtful, esp. one *under conditions determined by the experimenter*." Did the word as used by Mr. Stehlin mean that Dr. Bragg could safely administer the gas to himself through the analgesor under any and all conditions, as he chose? We think it clearly did not. Some experimentation is necessarily dangerous—as by a biologist with deadly germs; or by a chemist with poisons; or by an aviator with a new type airplane. Certainly a representation that such experiments could be conducted with safety would not mean, and could not reasonably be understood to mean, they could be conducted under any and all conditions. The illustration given under Sec. 311 of the Restatement is of a physician who tells his patient he can safely walk with a leg which has recently been fractured. But that plainly would not be an assurance that the patient could safely push a motor vehicle out of a ditch, or jump off an embankment.

In the present instance it was known the administration of nitrous oxide gas in uncontrolled quantities would be dangerous. The analgesor was a machine designed to administer and control the flow of the gas—that was its purpose. But could it be depended upon to do it automatically without the supervision of any human agency other than the person receiving the gas? We think the literature left by Mr. Stehlin with the machine shows that it could not; and that his oral representations must be construed in connection therewith. This literature does expressly state *safety* requires that the gas be administered by the patient to himself, rather than by the dentist or attendant; because the patient is more conscious of the effect being produced on himself. If danger attended the administration of the gas to the patient by the dentist under the dentist's own eyes, could it be safely self-administered alone? The literature clearly contemplated the *presence* of the dentist or some attendant. It cautioned that the hand bulb should not be pressed too vigorously; said the patient may lapse into a light, pleasant sleep; warns the dentist to watch how patient presses the bulb; quoted some "important authority" as saying he sometimes leaves the room *for a few minutes,* and spoke of the possible need of regulating the cylinder valve or the "measuring device" (which we infer is the reduction valve) from "off" to "heavy." Both of these were out of reach of the patient, it seems. At any rate, they were to be regulated by the attendant, not the patient. And finally the last paragraph of the literature, as quoted, supra, emphatically warned against any attempt to produce anaesthesia by the machine.

Can these statements in the literature possibly be harmonized with respondent's theory that Mr. Stehlin's representation meant, or reasonably could be understood to mean, that Dr. Bragg at the end of the day could safely lock himself up in an office with the windows shut, and with nobody else there or likely to be there until next morning, and administer the gas to himself? The deceased was forty-two years old and had been practicing dentistry for twenty years after graduation from a reputable dental school at Northwestern University; and had taught there. The use of the gas is taught in such schools, and it had been used by the profession for forty years. We do not say anything happened on the occasion of, Dr. Bragg's death, against which the literature warned—nobody knows what happened. But we think one precaution was omitted which the representation and literature obviously required, namely the presence of an attendant.

The closest question in the case, we think, is whether we have the right to rule as we have done, as a matter of law. The appellants stood on a demurrer to respondent's evidence. That evidence consists mainly of the literature delivered by Mr. Stehlin and the oral representation he made. It is held in Wendorff v. Mo. State Life Ins. Co., 318 Mo. 363, 369-370, 1 S. W. (2d) 99, 101(2), 57 A. L. R. 615, and several subsequent cases, that (italics ours) : ''When the proof is documentary, or the defendant relies on the plaintiff's own evidential showing (or evidence which the plaintiff admits to be true) *and the reasonable inferences therefrom all point one way,* there is no issue of fact to be submitted to the jury.'' But note the italicized words. And there are many cases—so many we merely cite 27 West's Mo. Dig. ''Trial,'' sec. 142, p. 165, pocket part, p. 50—holding that a demurrer to the plaintiff's evidence can be sustained only when the facts in evidence and legitimate inferences therefrom are so strongly against the plaintiff as to leave no room for reasonable minds to differ. In McCormick v. Lowe & Campbell Athletic Goods Co., 235 Mo. App. 612, 144 S. W. (2d) 866, a case somewhat like this, it was ruled the issues were for the jury. But the defect there (in a vaulting pole) was latent, and there was evidence that inspection would have disclosed the defect. We are driven to the conclusion in the instant case that there was *nothing* in appellant's representations to justify the solitary action of the deceased; and accordingly, the judgment is reversed.

Opinion modified on court's own motion. All concur.