299 F.2d 537
 H. James GEDIMAN, as Executor of the Last Will and Testament
of James E. Barsi, Deceased, and George A. Barsi, as
Administrator with the Will annexed of the Estate of James
E. Barsi, Deceased, Plaintiffs-Cross Appellants,
v.
ANHEUSER BUSCH, INC., Defendant-Appellant.
 No. 94, Docket 27075.
 United States Court of Appeals Second Circuit.
 Argued Nov. 29, 1961.
Decided Jan. 30, 1962.
 
 Thomas Kiernan (White & Case), New York City (Thomas B. Leary, New York City, of counsel), for defendant-appellant.
 Allen Moss (Meyer H. Slack), New York City (Herbert B. Rose, Edward Goodell, New York City, of counsel), for plaintiffs-cross appellants.
 Before CLARK FRIENDLY and KAUFMAN, Circuit Judges.
 FRIENDLY, Circuit Judge.
 
 
 1
 This action was brought in the Eastern District of New York by H. James Gediman, a resident of New York and executor under the will of James E. Barsi, admitted to probate in the Surrogate's Court of New York County, and George A. Barsi, administrator c.t.a. in California probate proceedings, against anheuser-Busch, Inc., a Missouri corporation, 28 U.S.C. 1332, for amounts allegedly due under the Company's pension plan or for misrepresentation in connection therewith. Judge Byers rendered a judgment in favor of plaintiffs for $73,754.02, which he held to be due under the pension plan, plus interest from November 17, 1957, and costs. Claiming only $32,780.44 to be owing, defendant has appealed; plaintiffs have taken a cross-appeal with respect to the dismissal of their alternative claim for misrepresentation. We hold that the Dsitrict Court erred in awarding judgment under the pension plan but that plaintiffs were entitled to recover on the basis that defendant negligently, although in good faith, misinformed Barsi as to the consequences of the election that he made upon retirement. Hence we reverse on both appeals, with a direction to enter judgment for plaintiffs as hereafter set forth.
 
 
 2
 As of November 1, 1947, Anheuser-busch had entered into a contract with The prudential Insurance Company of America for the issuance of retirement annunities to employees reaching the age of 65 or, in certain instances of prior retirement, an earlier age. Barsi was a participant in that plan, sometimes hereafter 'the Group Annuity Plan.' On November 1, 1952, the Group Annuity Plan was superseded by a Salaried Employees' Pension Plan, with St. Louis Union Trust Company as trustee.
 
 
 3
 The 1952 Plan provides that the Normal Retirement Date of any participant should be the first day of the month coinciding with or next following his 65th birthday; however, a participant, with the consent or at the request of the Company, might be sooner retired, at an Early Retirement Date. The plan defines 'Effective Benefit Date' as 'the date as of which the payment of his (a participant's) retirement or other severance benefits hereunder either commenced, or are scheduled to commence * * *' It says further that 'The Effective Benefit Date shall be the normal retirement date, although employment was previously terminated, unless an earlier date for the payment of benefits (called 'Early Benefit date'), shall have been selected and approved as hereinafter provided * * *' This has the effect, important as we shall see, that, for an employee retiring before normal retirement age, Early Retirement Date and Early Benefit Date are not at all equivalent terms; the former refers to a cessation of employment, the latter to a date, which may be the same or may be later, selected for benefits to begin and therefore in that event the Effective Benefit Date.
 
 
 4
 In stating the benefits to employees, the Plan Begins, Section 7, by a description of 'The normal retirement benefit, based on the assumption that employment and participation herein is continued to normal retirement date,' and of the 'basic method' of payment, to wit, 'an annual pension payable in equal monthly installments for the lifetime of the participant.' It then describes, Section 8, 'Alternate Methods of Distributing Lifetime Benefits,' permissible if 'on or before the Effective Benefit Date the participant shall have substituted, on the basis of their actuarial equivalent and with the approval of the Committee, one or more of the following 'alternate methods' of settlement.' One of these is 'The payment in one sum of the actuarial value of the benefit as of the Effective Benefit Date,' with the Pension Committee having the option to pay this in cash or 'by the purchase and transfer by Trustee of a commercial single premium annunity contract endorsed as the Committee may determine.' Next the Plan deals, Section 10, with Early Retirement Benefits. This section begins by saying that the normal retirement pension then accrued for an employee should be determined as provided in a formula therein described, and should 'become payable at normal retirement date, if he is then living.' However, at the employee's request, the Pension Committee may advance the Effective Benefit Date 'to the first day of any month occurring after such request and within ten (10) years of his normal retirement date, whereupon the accrued pension shall become payable on such Early Benefit Date, if the participant is then living, based on its actuarial value on such date * * *' Summarily stated, the amount that would have been payable if Barsi had become entitled to a pension would have been the sum of the actuarial values on the Effective Benefit Date of (1) his 'accrued past service pension,' i.e., for services before November 1, 1947, and (2) his 'accrued future service pension,'-- the latter being the proportion of the pension to which he would have been entitled for services after November 1, 1947, if he had retired at age 65, equal to the ratio which the number of years of his participation 'in this Plan and the Group Annuity Plan' bore to the number of years he would have participated had he remained in the Company's employ until that age.[1] Finally, the Plan contains a provision, Section 12, establishing a benefit for males dying 'on or before the Effective Benefit Date'; this benefit is defined as 'the then actuarial value of the future service pension which * * * shall have accrued during his participation in this Plan.' All these provisions and others were set forth, in somewhat-- but not much-- simplified form, in a booklet distributed to participating employees.
 
 
 5
 Barsi retired on August 31, 1956, having been on a paid leave of absence for the previous year. On that date he wrote a long letter to August A. Busch, Jr., defendant's president. He requested Mr. Busch's personal 'consideration and action' in the direction of some adjustment in the pension plan which, Barsi thought, 'does not give proper weight and consideration to employees with my length of service,' to wit, 25 years, who had been obliged to retire early, for ill health, after a relatively brief participation. 'In case your consideration is not forthcoming,' he wrote, 'it leaves me no alternative but to make a most serious decision which I am not qualified to make, I am not fully informed of all the various phases and ramifications contained in the Pension charter.' However, if Mr. Busch felt 'that work and effort does not warrant your special interest in me, it leaves me no alternative,' but to advise that 'I would like to receive payment of my pension in the form of a cash lump payment * * * or a single amount premium life annunity contract issued by an insurance company * * *,' the portions of the sentence here omitted containing references to the section of the participating employees' booklet summarizing Section 8 of the Plan, described above.
 
 
 6
 On September 17, 1956, Mr. Busch, signing himself 'Gussie,' gave his answer in a cordial letter addressed to 'Jim.' He stated he had 'had our Insurance Department follow through on your request and am attaching herewith the information that has been furnished me on the subject of your pension benefits by our pension consultants.' This, he felt, 'is as far as we can go notwithstanding that all of us and particularly myself were and still are interested in your personal Welfare.'
 
 
 7
 The memorandum enclosed with Mr. Busch's letter, prepared by Hayes & Co., the pension consultants, is of such crucial importance that we set it forth in full in the margin.[2] On October 15, 1956, Barsi replied. First stating his understanding of the illustration to be that 'if I elected to postpone a cash distribution, such cash distribution would be taxable as 'capital gains' in the year received by me,' he continued that 'Under the circumstances, it is my desire that the Committee defer the cash distribution to May 1, 1958, so that I may then report the distribution as a capital gain.' He asked that the Pension Committee be so informed. On November 19, 1956, the Company advised him the Committee 'has approved cash payment, on May 1, 1958, of the funds available to you' under the Plan.
 
 
 8
 Barsi died, as a result of an automobile accident, on November 17, 1957. Correspondence between his executor and the Company revealed a wide difference of opinion as to the rights of Barsi's estate, resulting ultimately in the bringing of this action. The amended complaint alleged three causes of action: The first set forth the Plan and Barsi's election 'to receive payment of $84,582. on May 1, 1958' thereunder; the second also set forth the correspondence and claimed the same amount; the third alleged that Barsi had elected on August 31, 1956, to receive $78,356. In cash or by the application of that sum to the purchase of an annunity and had been dissuaded from adhering to that election by false representations either knowingly or carelessly made, and claimed that amount 'reduced by the sum which plaintiffs are entitled to recover upon the prior causes of action herein.'
 
 I.
 
 9
 The theory of the first two causes of action as pleaded would seem to have been that Barsi, or rather his estate, became entitled, ex contractu, on May 1, 1958, to the Early Retirement Benefit provided in Section 10 of the Plan. This was clearly wrong. Barsi had elected May 1, 1958, as an 'early Benefit Date,' thereby making it 'the Effective Benefit Date.' Section 10 provided that in that event 'the accrued pension shall become payable on such Early Benefit Date, if the participant is then living.' Barsi was not. The lump sum Barsi had elected under Section 8 was simply an alternate method for obtaining the acturial equivalent of the monthly installments otherwise becoming payable on May 1, 1958; Barsi's right to the lump sum, like hs right to begin receiving monthly payments, was contingent on his being 'then living.'
 
 
 10
 Apparently in recognition of this, plaintiffs took a different tack with respect to the contract at trial. This was that Section 12, 'Payments Upon Death of Males Occurring on or Before Effective Benefit Date,' entitled Barsi's estate to the actuarial value, on the day of his death, November 17, 1957, of the 'future service pension' based on Barsi's service from November 1, 1947 to August 31, 1956, that would have become payable upon Barsi's normal retirement date. The latter was computed at $9,353 per annum,[3] and its actuarial equivalent, at November 17, 1957, at $73,754.02. Defendant countered that Section 12 spoke not of the entire future service pension to which a participant would have become entitled, but 'of the future service pension which * * * shall have accrued during his participation in this Plan,' i.e., participation in the 1952 plan but not also previous participation in the 1947 plan' this was computed to be only $32,780.44. Defendant argued that this was what the words plainly said, and that its view was reinforced by the contrast of the quoted language with other provisions, not applicable on the facts here, which spoke of 'participation in this Plan and the Group Annunity Plan.'
 
 
 11
 The judge accepted plaintiffs' interpretation. He said, in an opinion, that the difference in the two amounts 'is so wide that an explanation for it should be convincing'; that 'There is no testimony in the case to explain why as a matter of principle, services rendered from 1947 should enter into the pension payment but not the death benefit'; that 'the need for providing funds to meet such a pension payment figure from 1947, have not been shown to differ from a like fund to meet a claim for death benefits'; and that there was no 'demonstration in the record' that 'an extended hazard' was 'introduced in 1952 so that the fund became subject to a heavier impost than theretofore,' which would afford 'an apparent reason for not dating back the death benefit.' In the same opinion he dismissed 'the third cause pleaded by the plaintiffs' 'for failure to sustain their burden of proof.'
 
 
 12
 Prior to the entry of judgment, defendant moved the court to amend its findings or, in the alternative, to receive further testimony. An affidavit of counsel called attention to evidence in the record which showed that no death benefits were provided in the 1947 plan, and stated 'There has never been any doubt or question that the group annuity plan which had been in effect prior to November 1, 1952, afforded no death benefit to employees.' An affidavit of Collins, an actuary employed by defendant's pension consultants, to which a copy of the Group Annuity Plan was attached, confirmed this, and showed that the death benefit, provided for the first time in the 1952 Plan, did constitute an added burden. The court deeming 'that Collins' trial testimony has been expanded to embrace the expository substance of his said affidavit,' held that this still did 'not explain why the disposition of the Barsi claim does not invoke Section 10 in construing the meaning to be attached to the words 'this Plan' in Section 12.' Accordingly the court denied defendant's motion and entered judgment for $73,754.02 with interest from November 17, 1957, and costs. Defendant has appealed; plaintiffs cross-appeal 'only in so far as and only to the extent that said Judgment and the decision of this Court, filed on March 28, 1961, dismiss plaintiffs' third cause of action.'
 
 
 13
 The judge's decision placed on defendant a burden of explanation it was not required to bear. Section 12 stated, in the clearest possible terms, that, for the purpose of computing death benefits to employees who died before the Effective Benefit Date, furure service pension should be taken into account only insofar as it 'shall have accrued during his participation in this Plan.' If there were any doubt about whether 'this Plan' meant only the plan effective as of November 1, 1952, which there was not, it would have been resolved by other provisions wherein, when participation in the "Group Annuity Plan,' sometimes called 'predecessor plan," was to be taken into account, the draftsman said so. However, if explanation were needed for the wide difference in result between what the Plan plainly said and what it did not say, this was readily at hadn. The predecessor plan was a Group Annuity Plan; nothing warranted an assumption that the earlier plan contained a benefit for death prior to the date when an annuity certificate was to be delivered and, in fact, the record contained abundant evidence that it had not. Under such a plan the gains to the fund from mortality of participants before the delivery of annuities are, of course, taken into account in computing the amount of the latter-- in other words, the annuities are pro tanto larger than the same contributions would bring if death benefits for participants dying before the delivery of annuities were also provided. It was thus altogether natural that when the predecessor plan was folded into a new one providing a death benefit for employees dying before the date when their pensions would begin, the death benefit should be related only to years of participation in the new plan, which would take this added burden into account by large payments from the Company, smaller retirement benefits, or some combination of the two.[4] All this was fully explained in testimony discussed below and also in Collins' post-trial affidavit which the judge received. We therefore reverse on defendant's appeal.
 
 II
 
 14
 Since an award exceeding the $32,780.44 admittedly payable as a death benefit under Section 12 cannot be sustained on a theory of contract, it remains to inquire whether plaintiffs were entitled to recover on the theory of tort asserted in their third cause of action which the court dismissed. The relevant rule is stated in 552 of the Restatement of Torts which we quote in the margin,[5] see also 1 Haper and James, The Law of Torts (1956) 7.6, and Judge Cardozo's famous opinion in Glanzer v. Shepard,233 N.Y. 236, 135 N.E. 275 23 A.L.R. 1425 (1922).[6] The relationship between defendant and its pension consultants, and Barsi, was plainly of the sort, described in the Restatement, where negligent communication, or failure to communicate with clarity, may give rise to liability; the questions are whether that occurred, whether Barsi relied, and whether harm was suffered thereby.
 
 
 15
 To answer these questions we must first turn to the Hayes & Co. memorandum, quoted in fn. 2, which was enclosed with Mr. Busch's letter of September 17, 1956. This said, inter alia, that Barsi had a 'vested interest, present value $78,356' which 'could be deferred by the Committee and distributed to you on May 1, 1958, in the amount of $84,582.' to anyone acquainted with pension plan terminology, this does not mean at all what plaintiffs say it meant-- namely, that Barsi owned this money just as if it were in a savings account. In pension language 'A participant has a vested interest if he is entitled to receive his rights at all events, except for his failure to live long enough to enjoy them', Rice, Income Tax Consequences to Employee-Beneficiaries of Pension and Profit-Sharing Plans, in Sellin ed., Taxation of Deferred Employee and Executive Compensation (1960), at p. 356, citing Treasury regulations 1.402(b)-1(a)(2). Although Barsi could not be expected to have such expert knowledge, the memorandum was so worded that he must have understood that deferring the payments might lead to some diminution in the event of his prior death. For the memorandum told him that if death occurred 'prior to your receipt of such distribution, the death benefit would not be as much as the death benefit described in (paragraph) 2 * * *'
 
 
 16
 Paragraph 2, which had described the possibility of the trustee's purchasing single premium deferred annuities in the amount of the 'present value' of Barsi's pension rights (slightly augmented to $79,690 by the postponement of two payments), had told Barsi that this death benefit, if realized before annuity payments began, would be the amount of the single premium paid, or cash value, if greater, i.e., at least $79,690, if no annuity payments were taken. The failure of communication was that, although the memorandum warned Barsi that, in choosing the lump sum, he would be taking a risk of some diminution in the event of death prior to May 1, 1958, it did not do this adequately. 'Would not be as much as' is not an apt description of the relationship of $32,780.44 to $79,690-- in the language of the Restatement, the pension consultants did not 'exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting.' Hayes & Co. knew that the Plan provided a wholly different regime if Barsi should die before rather than after his 'Effective Benefit Date'; the 'death benefit' described in paragraph 3 of their memorandum differed from that in paragraph 2 not just in degree but in kind. The former was a provision in the 1952 Plan reflecting only amounts accrued during participation in that plan; the latter was a provision in an annuity purchased on retirement through the application of funds created under both the 1947 and the 1952 plans. To say that the former 'would not be as much as' the latter would not convey to the ordinarily unlearned pensioner that on this account it would be only 42% as much.
 
 
 17
 Defendant urges that even if such a statement might have misled others, it could not have had that effect on Barsi since, as defendant claims, he was fully conversant with the plan. Testimony to support this was given by Stauber, an employee of Hayes & Company, by Rathert, an employee of defendant, and by Green, an insurance agent. Stauber testified that in June, 1953, defendant asked him to endeavor to answer some criticisms Barsi had made of the 1952 plan. For this purpose Stauber prepared a comparison, which he ultimately left with Barsi, of the benefits Arsi would receive under the new plan as against the old; this showed, inter alia, that under the new plan Barsi would be entitled at retirement at age 55 to a lump sum of $79,064, but that, if he died at that age prior to retirement, his death benefit would be only $41,984. Stauber further testified that Barsi had asked the reason for the discrepancy, and that Stauber explained that the larger sum reflected Barsi's pension rights for the entire period of his credited service, whereas the death benefit 'was attached to the plan only on the basis of service rendered after November 1, 1952.' He also pointed out to Barsi that, to assist employees with the problem that this created, the Company had made made it possible for employees to purchase term insurance which would reduce as retirement age approached,[7] and drew a diagram illustrating how this operated. Rathert testified that, in the spring of 1955, Barsi asked for some information as to his estimated pension benefits. Ultimately Rathert prepared a rather comprehensive schedule estimating what Barsi would receive on various assumptions, in the way of monthly retirement income, one-sum value, and death benefits; these calculations showed 'Death benefits if employment continues to age shown' substantially less than 'One-sum value at indicated age if terminating at age shown.' Rathert testified he pointed out 'that there was quite a lot of difference between the death benefits and the retirement benefits under certain-- under any of the conditions' and that 'Mr. Barsi said that he appreciated, he understood, that there were differences and appreciated getting the information very much.' Green testified to a conversation with Barsi in the spring of 1955. Barsi inquired why other officers of the Company were buying life insurance; Green 'explained that at the beginning of the plan there was very little the money for a life insurance benefit and that what these people were doing was buying life insurance to make up the difference between what they would get if they died before they retired from the fund, and so they would provide themselves or their families or their beneficiaries with a sum equivalent or more, whatever they wanted, that they would get if they lived to retirement age; and that was a reducing term.' Green also drew a diagram.
 
 
 18
 This testimony leaves little doubt that Barsi was aware that if he died while in Anheuser-Busch's employ, the death benefit would be substantially less than what he could receive as a lump sum immediately upon early retirement. What it does not make clear is that Barsi realized the same consequences would ensue if, as happened, he died after retirement but before what he had elected as an 'Early Benefit Date'; indeed, the column in Stauber's calculation, headed 'Death Prior to Retirement,' might have led him to believe exactly the opposite.
 
 
 19
 It is true that one experienced in pension-plan matters would know that what Barsi elected to do was, in its pension effect, similar to taking an unpaid leave of absence until May 1, 1958, and that death in that interval would have results like what would have occurred if he had died while fully employed; but Barsi could not have been expected to know this without being told. Neither the Plan nor the employees' booklet, so beautifully clear to the experienced draftsman, used the kind of language that is fully understandable by even an intelligent layman; perhaps it is just not possible to do so. When the action is on the contract, defendant may properly insist that the boundaries of its obligation are marked out by the technical terms used, whether Barsi understood them or not; but when Barsi sought advice and defendant gave this, it was bound to take account of the frailties of human understanding. By his letter of August 31, 1956, Barsi placed himself in defendant's hands. Defendant was not required to accept him; it could have suggested he consult his own advisers. Having undertaken to advise, defendant was bound to advise clearly. 'It is ancient learning that one who assumes to act, even though gratuitously, may thereby become subject to the duty of acting carefully, if he acts at all.' Glanzer v. Shepard, supra, 233 N.Y. at 239, 135 N.E. at 275. Barsi had indicated that, acting on his own, he would choose the cash lump sum or the single premium annuity. If he was to be told that the lump sum could not be made available in the single payment that would permit capital gains treatment but that another course, a deferred cash distribution, would give this tax advantage, he should have been plainly warned that the risks incident to death, about which he had earlier been apprised with relation to the period prior to retirement, would continue until whatever date he picked for the distribution. Although we are sure everyone was acting in the best of faith, that needed statement was not forthcoming; instead, the memorandum made one of a dengerously lulling sort. Though the error was by defendant's advisers, defendant adopted it and, as between it and Barsi, is responsible on principles too familiar to require citation of authority.
 
 
 20
 Defendant says that, however we might decide this issue of Barsi's reliance if we were triers of the facts, Judge Byers found in defendant's favor, and such a finding is not clearly erroneous, F.R.Civ.Proc. rule 52(a). We do not so read what the judge said. The critical sentence, in the first opinion, is this:
 
 
 21
 'Since the defendant had nothing to gain or lose as the result of Barsi's election, there was no temptation to misrepresent, nor is there any evidence to sustain the argument that by failing to state the amount which would be payable as a death benefit, the defendant practiced any form of deceit or misrepresentation, active or passive, that caused Barsi to select the form of payment which he supposed would be most favorable to him.'
 
 
 22
 To us this seems directed to the issue whether the letter of September 17, 1956, met the applicable standard of care-- not whether Barsi relied on it, as to which a much fuller discussion of the evidence would have been needed. If we are right in so reading the opinion, we are in no way concluded by it. For it has long been the rule in this Circuit that 'a judge's determination of negligence, as distinguished from the evidentiary facts leading to it, is a conclusion of law freely reviewable on appeal and not a finding of fact entitled to the benefit of the 'unless clearly erroneous' rule.' Romero v. Garcia & Diaz, Inc., 286 F.2d 347, 355 (2 Cir.), cert. denied, 365 U.S. 869, 81 S.Ct. 905, 5 L.Ed.2d 860 (1961), citing many cases. Furthermore the judge's comment must be read in the context of his belief that the death benefit that actually became payable was $73,754; on that view the statement in the memorandum that the death benefit 'would not be as much as the death benefit ($79,690) described in (paragraph) 2' would not have misled.
 
 
 23
 What defendant can truly say is that the judge did not make a finding that Barsi was misled-- on his view of the case he did not reach that issue. Although we could remand for such a finding, we see no occasion for doing so. The issue, what was in the mind of a person deceased prior to the trial, is not one as to which a trial judge can have greater competence than judges of appellate courts. Very likely we ought not make a finding on that issue against the plaintiffs here, since doing so would necessarily involve accepting the testimony of defendant's witnesses, which the trial judge, on the basis of demeanor, perhaps would not have done. However, when, accepting the testimony as we do, we would still find that Barsi was misled, we are free to make the finding, see Westley v. Southern Ry., 250 F.2d 188 (4 Cir. 1957); Burman v. Lenkin Const. Co., 80 U.S.App.D.C. 125, 149 F.2d 827 (1945); cf. 5 Moore, Federal Practice (2d ed. 1951), 52.04.
 
 
 24
 Defendant has still another string to its bow. It argues that Barsi was not hurt, since the adverse income tax consequences of any course other than what he chose would fill the gap between the present value of his pension rights, $87,356, as of October 1, 1956, and the $32,780.44, which is all that is now payable to his estate as a death benefit under the Plan. Assuming that such tax consequences are appropriate for consideration, cf. McWeeney v. New York, N.H. & H.R. Co., 282 F.2d 34 (2 Cir.), cert. denied, 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93 (1960), at least plaintiffs made a prima facie case of damage by showing the difference in the gross amounts and defendant had the burden of going forward with evidence to prove this would all have disappeared in the tax collector's maw. Defendant was far from doing this. We are not even completely certain as to the validity of its initial assumption, namely, that the requirements of Mim. 5717, 1944 Cum.Bull. at p. 322, as built into Part III of the Plan, would have prevented the payment of the entire $78,356 in a single year, which was necessary to qualify for capital gains treatment under 402(a) (2) of the 1954 Code, 26 U.S.C.A. 402(a)(2).[8] Barsi was not bound to follow the course that would have had the worst income tax consequences, that of piling $65,558 into a year, 1956, for eight months of which he had been receiving a high salary. Indeed, the memorandum itself suggests one plan that would have worked out excellently tax-wise, the purchases of single premium annuities and election to take no income thereunder, with the result that the amount payable on death would be taxable as a capital gain and would not be included in Barsi's estate, Int.Rev.Code of 1954, 403(a)(2) and 2039(c), 26 U.S.C.A. 403(a)(2), 2039(c).
 
 
 25
 We hold therefore that plaintiffs made out their third cause of action, in tort, for the difference between $78,356 with interest from October 1, 1956,[9] and the death benefit actually payable.
 
 
 26
 This leads us to defendant's final contention, namely, that the action ought not to have been brought against it but rather against the trustee under the Plan. The tort claim clearly lay against the Company, not the trustee. It might still be argued that any judgment on that claim should be solely for the excess of $78,356 over the $32,780.44 payable out of the fund. For reasons stated in appellant's brief we think judgment may properly be rendered against the Company for the full amount; we doubt it will find much difficulty in making the proper adjustments with the trustee.
 
 
 27
 We therefore reverse on both appeals and direct that judgment be entered in favor of plaintiffs for $78,356 with interest from October 1, 1956, and the costs awarded below and interest thereon, but without costs on appeal.
 
 
 
 [1]
 Since Barsi had been a participant from 1947 but had retired in 1956, at age 55, this proportion would have been 9/19
 
 
 [2]
 'ILLUSTRATION REGARDING PENSION BENEFITS APPLICABLE TO RETIREMENT OF JAMES E. BARSI ASSUMING DISTRIBUTION COMMENCES
 OCTOBER 1, 1956
 W. ALFRED HAYES & CO., PENSION CONSULTANTS 1212 South Big Bend Road, St. Louis 17, Mo.
 
 
 [1]
 Cash Distribution: Present value $78,356, distributable with interest as follows:
 1956 1957 1958
$65,558 $10,000 $4,132
 Taxable as 'ordinary income' as received.
 
 
 [2]
 Single Premium Deferred Annuity Contracts:
 In 1956, 1957 and 1958, the Trustee of the Plan would purchase and assign over to you, such single premium deferred annuity contracts as could be purchased in those years by application of the amounts shown in 1.
 Your taxable receipt of 'ordinary income' would not commence until you chose to take payments under such contracts; the death benefit under the contracts would not be included in your taxable estate (before payments start the death benefit would be the single premium paid, or cash value, if greater; after payments start the death benefit would depend upon income option selected by you); and any amount provided the entire benefit is received by your beneciary in one calendar year, would be taxable as a 'capital gain'.
 
 
 [3]
 Postponed Cash Distribution:
 Your vested interest, present value $78,356, could be deferred by the committee and distributed to you on May 1, 1958, in the amount of $84,582, or even deferred further and distributed at age 65 in the amount of $136,122.
 Such cash distributions would be taxable as 'capital gains' in the year received by you. If your death occurs prior to your receipt of such distribution, the death benefit would not be as much as the death benefit described in 2, but taxwise, the death benefit would be treated the same as in 2.
 These comments regarding taxes are based on present laws.
 Please note in the above illustrations that the amounts mentioned, representing one-sum 'present values' are slightly lower than those furnished on the basis of an illustration of early retirement benefits sent to Mr. Barsi last year. That variation is due to the fact that since the original illustration was prepared, the Government required Anheuser-Busch, Inc. to increase, retroactively, the interest discount rate used in determining present values, from 2 1/4% to 2 1/2%.
 Please note also from the above illustration that we are unable, under the Plan, to give Mr. Barsi the full amount this year, but that May 1, 1958, is the earliest date on which Mr. Barsi's entire benefit could be paid to him in one installment so as to enable him to use the capital gains tax rate. This restriction is imposed upon the Plan by the Government by reason of the fact that Mr. Barsi was included in the list of twenty-five highest paid employees.
 Methods of monthly income payments have not been included in illustration, as apparently Mr. Barsi is not interested in that type of distribution.'
 
 
 [3]
 This was 9/19 of $19,746-- the pension for 'future service' to which Barsi would have become entitled had he worked until May 1, 1966
 
 
 [4]
 The contrast between the death benefit of $32,780.44 as of Nov. 17, 1957, and the much larger amount payable to Barsi if alive on his Effective Benefit Date is likewise without significance; the latter had been funded by payments made under both plans for that precise purpose. The good fortune (pension-wise) of an employee who dies the day after his Effective Benfit Date and thereby realizes much more from having elected a lump sum than he would have on a monthly payment basis is balanced by the ill fortune (pension-wise) of the employee making a similar election who lives to be a hundred and would have received much more on a monthly payment basis than through the lump sum. For the actuary these differences, so meaningful to the individual, are meaningless; all such cases wash out in time
 
 
 [5]
 '552. INFORMATION NEGLIGENTLY SUPPLIED FOR THE GUIDANCE OF OTHERS
 One who in the course of his business or profession supplies information for the guidance of others in their business transactions is subject to liability for harm caused to them by their reliance upon the information if
 (a) he fails to exercise that care and competence in obtaining and communicating the information which its recipient is justified in expecting, and
 (b) the harm is suffered
 (i) by the person or one of the class of persons for whose guidance the information was supplied, and
 (ii) because of his justifiable reliance upon it in a transaction in which it was intended to influence his conduct or in a transaction substantially identical therewith.'
 
 
 [6]
 Since the pension plan was administered in Missouri and the alleged misstatement came from there, a New York court would apply Missouri law to determine the existence and scope of defendant's liability for negligent misrepresentation, although Barsi was in California at the time. However, the relevant Missouri law was here neither pleaded nor proved, nor did the District Court make any inquiry into Missouri law of its own motion. Although a New York court may take judicial notice of the law of a sister state, N.Y.Civ.Prac.Act 344-a, and the District Court might therefore have done the same, F.R.Civ.Proc. rule 43(a), 28 U.S.C.A., the court is not bound to do this, especially when counsel have not adequately assisted it in learning the foreign law, compare Walton v. Arbian American Oil Co., 233 F.2d 541, 544 2 Cir. 1956). Instead, where, as here, the foundation of the sister state's jurisprudence is the common law a New York court would presume 'that the common law still prevails there and that it is the same as the common law of New York,' Arams v. Arams, 182 Misc. 328, 332, 45 N.Y.S.2d 251, 254 (Sup.Ct.1943). See Southworth v. Morgan, 205 N.Y. 293, 296, 98 N.E. 490, 491, 51 L.R.A.,N.S., 56 (1912); International Text Book Co. v. Connelly, 206 N.Y. 188, 200-201, 99 N.E. 722, 727, 42 L.R.A.,N.S., 1115 (1912); Matter of Marchant v. Mead-Morrison Mfg. Co., 252 N.Y. 284, 303, 169 N.E. 386, 392 (1929); Weissman v. Banque De Bruxelles, 254 N.Y. 488, 495, 173 N.E. 835, 837 (1930); Cherwien v. Geiter, 272 N.Y. 165, 168, 5 N.E.2d 185, 186 (1936); Read v. Lehigh Valley R. Co., 284 N.Y. 435, 441, 31 N.E.2d 891, 893 (1940); Zwirn v. Galento, 288 N.Y. 428, 432, 43 N.E.2d 474, 476 (1942). A federal court sitting in New York may do the same. New York recognizes a common law cause of action for negligent use of language, Glanzer v. Shepard, 233 N.Y. 236, 135 N.E. 275, 23 A.L.R. 1425 (1922); International Products Co. v. Erie R. Co., 244 N.Y. 331, 155 N.E. 662, 56 A.L.R. 1377 (1927); Doyle v. Chatham & Phenix Nat'l Bank, 253 N.Y. 369, 171 N.E. 574, 71 A.L.R. 1405 (1930). Although we therefore need not go beyond New York law, it seems that the law of Missouri now is not different. Early cases denied recovery in situations similar to the Glanzer v. Shepard one, Gordon v. Livingston, 12 Mo.App. 267 (1882) (negligent grain weighing); Zweigardt v. Birdseye, 57 Mo.App. 462 (1894) (negligent preparation of title abstract), on the ground of lack of privity between plaintiff and defendant. Later, however, it was recognized that negligent misrepresentation could give rise to tort liability, at least to the addressee of the misstatement, Bragg v. Ohio Chemical & Mfg. Co., 349 Mo. 577, 162 S.W.2d 832 (1941) (dictum that there could be tort liability to buyer for seller's negligent representation of fitness for particular use). Also Missouri has held a notary public liable for negligently false certification, State ex rel. Park Nat'l Bank v. Globe Indemnity Co., 332 Mo. 1089, 61 S.W.2d 733 (1933), a position said by Professor Seavey to be ordinarily indicative of a recognition that a speaker can be liable to the addressee of his negligent statement for harm caused thereby, if the speaker might reasonably have expected that his addressee would be so harmed, Seavey, Torts, 34 N.Y.U.L.Rev. 517, 523 (1959)
 
 
 [7]
 With more years of service under the 1952 plan, the ratio of the death benefit in the event of death prior to retirement to the lump sum available on retirement would naturally increase
 
 
 [8]
 The record does not show how Hayes & Co. arrived at the figure of $65,558, which was though to be the maximum payable in 1956. Taking Barsi's average salary as $48,180, the figure used in other calculations, and assuming that the date for beginning the computation is November 1, 1947, the mimeograph would have permitted payment in 1956 of some $80,000-- more, indeed, than Barsi was entitled to receive. If this be so, the Hayes & Co. memorandum contained a second misrepresentation. However, we do not rely on this possibility
 
 
 [9]
 This figure may appropriately be used to measure damages even if defendant was prevented from paying the full sum in 1956, see fn. 8; admittedly defendant could have paid a somewhat larger sum over three years, either directly or for the purchase of annuity contracts, see fn. 2, and use of the smaller figure and the earlier date avoids the compounding of interest that would result from using the higher figures and later dates