Edith S. MARKUS, Appellant,

v.

PENN MUTUAL LIFE INSURANCE
CO., Appellee.

No. 20247.

United States Court of Appeals
District of Columbia Circuit.

Argued Jan. 12, 1967.

Decided June 12, 1967.

Petition for Rehearing En Banc
Denied Aug. 24, 1967.

Leventhal, Circuit Judge, dissented.

Mr. Stanley Klavan, Washington, D. C., with whom Mr. J. H. Krug, Washington, D. C., was on the brief, for appellant.

Mr. Frederick A. Ballard, Washington, D. C., and Mr. John L. Esterhai, Philadelphia, Pa., of the bar of the Supreme Court of Pennsylvania, pro hac vice, by special leave of court, for appellee.

Before PRETTYMAN, Senior Circuit Judge, and TAMM and LEVENTHAL, Circuit Judges.

PRETTYMAN, Senior Circuit Judge:

Appellant brought a civil action in the District Court as the beneficiary of one Samuel J. Sugar (her brother) in a retirement plan of the Penn Mutual Life Insurance Co. Mr. Sugar had been for many years an agent for that company. His retirement date under the plan was at age 65, which at the time of the events here involved was slightly more than five years away. He had contracted cancer, and the disease had progressed rapidly.

The plan provided that if the employee died or retired before the retirement date the company would pay the designated beneficiary the sum total of the employee's contributions to the fund, plus interest; but if he lived beyond the

retirement date the company would match those contributions. Thus life of the employee beyond the designated retirement date could double the amount paid the beneficiary. The plan contained a provision permitting an employee to expedite his retirement date under certain conditions and procedures.

In the late summer of 1962 senior officers of the company, being advised of the critical condition of Mr. Sugar, sent their general agent in this area to call upon him and to suggest to him an early retirement; this might increase considerably the eventual payment to his beneficiary. The call was made on October 1st, and the matter was discussed. Mr. Sugar acquiesced but selected his sixtieth birthday, November 11, 1962, as his retirement date. His son later wrote the company: "Knowing Dad as you did, I think you will understand, as I'm sure Wayne [the local general agent] does, that his last challenge was to live to see his 60th birthday —which would have been November 11th. It was for this reason alone, I know, that he picked the date—and *stuck* to it." The emissary sent by the company suggested to Mr. Sugar that he "retire right away" and expressed his own view that Mr. Sugar should do so. The company officers knew and the family knew that Mr. Sugar's illness was in a terminal phase, but the record indicates that he did not know it and that the family, at least as represented by the son, "would not suggest this to him for any amount of money." Mr. Sugar died on November 8, 1962. The company paid the beneficiary the amount provided by the plan for cases in which death of the employee occurred before the designated date of retirement. The beneficiary sued to recover the additional amount which would be the company's matching contribution. The District Court rendered summary judgment against her.

Upon this appeal the beneficiary appellant contends that under the law of torts and under the law relating to fiduciaries the company "owed a duty to use its utmost efforts to induce Mr. Sugar to retire immediately." Upon this premise she builds her claim.

It appears clear from the record that the only information which would have induced Mr. Sugar to expedite his retirement to a date prior to his sixtieth birthday was the medical opinion that his demise was imminent. But the family was insistent that this word not be given him, a natural position premised no doubt upon affection. It also seems clear to us that the responsibility for this lack of action, which is critical to the present claim, lay as much, if not more, upon the family as upon the company. We do not see how the family can shift to the company an obligation which they themselves shared but thought it best not to exercise. Even if the company occupied a fiduciary relationship toward Mr. Sugar, its obligations as such did not go so far as to require it to violate the clear wishes of the family in this extremely personal matter of fact.

Approaching the matter from the viewpoint of the law, we are not shown any provision which requires, or even empowers, the company to advance the retirement date set by an employee or to compel the employees to do so. From the moral standpoint we see no principle which would require a company in such a situation to impose its views upon an employee despite his own decision and the judgment of his family. Mr. Sugar was an expert in pension and retirement plans and knew better than most people the scope and the limits of such plans. There was no misrepresentation here; the company stood, literally, ready and willing to implement instant retirement. Our appellant points to the equitable principle that he who undertakes to advise must do so to the full. But that principle does not apply here. Equity is not an exercise in lifeless semantics; indeed it came into existence because the law was tending to mummify. The moral problem, as we have indicated, was the persuasion of Mr. Sugar to select an immediate retirement date, and the only effective persuasion, as shown by this record, would have been

the communication of news which the family wished kept from him. The moral obligation thus depicted was not upon the company.

 Our dissenter is of opinion that summary judgment should not have been entered and that the case should now be remanded for an evidentiary trial. As we see it, the facts here are not in dispute. The situation, the existence and terms of the retirement agreement, the call of the company's agent, the advancement of the retirement date by nearly five years, the agent's suggestion of immediate retirement, Mr. Sugar's response are established and not disputed. Claimant does not say the company did less than the present record shows; she says the company did just what it says it did, and no more. The dispute is whether it did enough; not what it did but whether what it did was enough to fulfill its legal obligation. This, we think, is the sort of question which is best handled by summary judgment.

Affirmed.

LEVENTHAL, Circuit Judge (dissenting):

In my view this was not a proper case for summary judgment. In a proper case, summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure is a beneficent and useful instrument of justice, uncluttering the docket and removing the pall of litigation hanging over parties who should not be subject to this cloud. Summary judgment is proper when there is no meaningful role to be played in the case by the judge or jury charged with the function of finding the facts and applying the law thereto, either because the facts are in effect stipulated or because the allegations of factual issues are feigned or sham and are not genuine in fact. Summary judgment is for the case where "it is quite clear what the truth is" and

there is really no issue to try.[1] In my view this is not such a case.

1. I begin with the key paragraphs of the memorandum of the District Judge in support of summary judgment, dismissing the action brought by appellant.

"The decedent, Samuel Sugar, was an outstanding agent of the defendant company for about thirty years. During the latter portion of his service, he became ill with cancer. This required an operation, from the effects of which he did not recover. It appears that the decedent entered into a retirement policy with his company and pursuant to this agreement, made contributions thereto. One of the provisions of this policy provided that if he died prior to reaching retirement age, he would be entitled only to his contributions and interest thereon. If, on the other hand, he survived the retirement date, his estate or the designated beneficiary would be entitled to the company's contribution in an equal amount plus interest in addition to his own. The expected retirement date was age 65 though provision was made for an earlier retirement at the election of the policyholder. It became evident that Mr. Sugar was seriously ill and unable to continue to perform his duties. This information was known both to him and to the company.

"There came a time when a representative of the company sought to ascertain and determine an earlier retirement date by conferring with him. He was at that time seriously ill and in the hospital. At this point of Mr. Sugar's life, his prime objective seemed to be to live until his 60th birthday, which would have been the 11th of November, 1962.[2] According to his deposition, Mr. Wayne Dorman, the agent in Washington for defendant, sought to persuade Mr. Sugar to accept the date of the conference, which

---

1. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 627, 64 S.Ct. 724, 88 L.Ed. 967 (1944); Poller v. Columbia Broadcasting Sys., 368 U.S. 464, 467, 472–473, 82 S.Ct. 486, 7 L.Ed.2d 458 (1962).

2. This finding of the District Court is not supported by the record, as appears from point 6 of this opinion.

was October 1, 1962, as the date of retirement. This advice was refused by Mr. Sugar, and he selected November 11, 1962, his 60th birthday. Unfortunately, death came first and Mr. Sugar died on the 8th of November, 1962. On these facts it appears that defendant's motion for summary judgment should be granted unless an issue of material fact is interposed."

2. The District Judge said he was granting summary judgment regretfully. I in turn regret that he did not discuss the shape of the case in terms of applicable legal principles. At least the starting point for my thinking is Gediman v. Anheuser Busch, Inc., 299 F.2d 537 (2d Cir. 1962). The company was held liable, in tort, notwithstanding its good faith, for failure to inform the employee adequately on the consequences of the election that he made upon retirement. Although the booklet distributed by the company concededly made everything clear to an experienced draftsman, Judge Friendly noted that where a company gives advice in conversation to an employee, it has a duty of acting carefully under which it is "bound to take account of the frailties of human understanding." In that case the employee "should have been plainly warned" that with the deferral of cash distribution under discussion, the risks incident to death would continue until the date of distribution.

3. Appellant's case sounds not simply in tort, but has at least overtones of the duty of care incident to a fiduciary relationship. Kosty v. Lewis, 115 U.S.App. D.C. 343, 348, 319 F.2d 744, 749 (1963), cert. denied, 375 U.S. 964, 84 S.Ct. 482, 11 L.Ed.2d 414 (1964). Appellee sought to dilute the fiduciary flavor of this case by arguing that it had no possible conflict of interest. Liability would not be negatived even if appellee's discussion with its agent arose only out of a sense of moral duty, but it is fair to suggest that this action was not necessarily unrelated to sound business considerations.[3] Obviously any payment based on advanced retirement date would increase appellee's obligation to make balancing contributions to the retirement plan reserve. This could be taken into account by the fact trier in determining whether and to what extent appellee spoke out plainly or in any event as plainly as it should.

4. Reverting to what does, or rather does not, clearly appear from Mr. Dorman's deposition, he testified that an officer of appellee told him to raise the early retirement issue with Mr. Sugar and he did so. Mr. Sugar requested information of the home office as to certain types of elections he could make. Subsequently came the conference of October 1, which took place in Mr. Sugar's apartment. Mr. Dorman took with him papers with the retirement date of November 11, 1962 typed in. Deponent testified: "I suggested that he go ahead and make it right now [October 1]." (Dorman Dep. 29). Mr. Dorman admitted, however, that he could not recall specifically how he put this to Mr. Sugar, and he did not know why Mr. Sugar did not want to advance the date. (Dorman Dep. 43).[4]

Liability may turn on whether and to what extent defendant acted carefully and warned Mr. Sugar plainly. Yet Mr. Dorman's deposition is not only not clear

3. Business companies are not unaware that it is good business to be fair, or at least to have the reputation of being fair. A company's willingness to advise its employees and agents of their alternatives in time of trouble, rather than be regarded as devoid of concern for their welfare, may be an important asset housed in the conception of a going concern with good relations with agents, perhaps one of the most important if intangible of the "good will" assets of an insurance company.

4. Q. The reason why it was preferable to take the earlier date was that his condition was such that he might die before the later date arrived? A. Yes, I felt that way.
 Q. Your testimony is that you urged him because of that reason, to take the earlier date. Is that right? A. Yes, sir.
 Q. He refused to take the earlier date, even though you urged him for the reason stated? A. I don't know for what reason he didn't want to do it, but he didn't.

—it is positively murky at critical points. And the judge had no opportunity to observe Mr. Dorman's demeanor. Where proof of a fact may turn on the testimony of defendant or his agent, and his uncorroborated affidavit or deposition is not straightforward and clear, the fact that "defendant's demeanor on the stand in testifying on these matters may also lead to inferences favorable to plaintiff," argues against summary judgment under Rule 56. Cellini v. Moss, 98 U.S.App. D.C. 114, 116, 232 F.2d 371, 373 (1956).

5. We need not pursue the matter of what we do not know. What we do know —about what Mr. Dorman did not tell Mr. Sugar—is enough to indicate that there was a question for the trier of fact at a trial. Mr. Dorman did not tell Mr. Sugar that the retirement benefit available if Mr. Sugar lived to November 11, exceeded by only a miniscule amount (a matter "of pennies") the benefits available if he retired on October 1. Furthermore, Mr. Dorman's contemporaneous notes reveal that Sugar "wanted to make his October payment, so the papers could be calculated reflecting that payment being made." (Dorman Dep. 35). Mr. Dorman knew that towards the end of October the next payment would be made automatically by the bookkeeper. Yet he admitted he did not tell Mr. Sugar that retirement could be made effective, including the October payment, as of October 31, with exactly the same benefits as retirement on November 11!

With these omissions in the record, plaintiff was entitled to a trial both to determine what Mr. Dorman did and did not do, and also to determine whether, in view of his indisputable shortfall, appellee's duty to speak plainly and carefully remained unsatisfied. The facts are not clear to the point of establishing a defense beyond dispute or beyond the inferences and judgments of the fact trier.

6. The District Court stated: "At this point of Mr. Sugar's life, his prime objective seemed to be to live until his 60th birthday, which would have been the 11th of November 1962." What to the District Court "seemed" to be the fact has apparently become crystallized in the majority opinion as the plainly established reason why Mr. Sugar did not advance his retirement date from November 11, 1962.

In my view the record before us does not contain one line that can be adduced in support of this statement or premise. Let me demonstrate by turning to the statements of Mr. Sugar's son and of Mr. Dorman.

a. *Mr. Sugar's son*

In a letter written after Mr. Sugar's death by his son there is an assertion that it was only because Mr. Sugar was resolved to live until he was 60 that he failed to advance the retirement date. But the son's hearsay letter is not admissible against appellant, for the son, as co-executor, was aligned by appellee as a party adverse to appellant, as a third party defendant who must make a substantial payment to appellee if appellant should prevail.[5] And in this litigation the estate in effect took a tactical position contrary to the interest of appellant.[6]

The inadmissibility of the son's letter against appellant is not critical, since the son's deposition was taken by appellee. What is in that deposition? Appellee

---

5. This arises from the fact that the document whereby Sugar advanced his eligibility date to November 12, 1962—which appellant says would have been still earlier except for the appellee's delict—was also the document whereby appellant became a beneficiary. Appellee treated that document as lapsing, due to the failure of Sugar to live until November 11, 1962, and paid the lesser amount to decedent's estate.

6. Counsel for the executors objected to certain questions propounded of Marvin Sugar by plaintiff on deposition, (Sugar Dep. 80–82), and presented to the District Court the executors' interest in an expeditious determination so that the estate might be settled promptly. (Trial Tr. 15–16.)

elicited merely that the son wrote the letter but did not ask the son to testify on oath as to the truth of what he had written, or ascertain whether it rested on more than conjecture, or whether he had any basis for making that assertion.[7] It is clear both from the express language of Rule 56 and the decisions of this court that summary judgment cannot be predicated on statements in letters or in other papers unless either they are admissions or there is sworn testimony, in affidavits or depositions, affirming that the facts were as stated in the unsworn papers. Goldman v. Summerfield, 94 U.S.App.D.C. 209, 210, 214 F.2d 858, 859 (1954).

To cap the climax, appellee's motion for summary judgment complained to the District Court of "constant evasiveness of his [the son's] answers on his deposition." The claim that a deponent is evasive is a reason for a trial where the fact trier can assess his demeanor. It is hardly a basis for a judgment without a trial on that deponent's letter. That letter is not only inadmissible, but, taken in conjunction with the deposition, has been stripped of any support that would show that the statement rests on anything more than speculation.

b. *Mr. Dorman*

There is not a word in Mr. Dorman's deposition that he was aware from father, son or anyone else that Mr. Sugar was guiding, much less controlling, his action by the star of an inner resolve to live it out to his 60th birthday.

If we look to contemporaneous documents that are admissible in evidence, why we find Mr. Dorman's notes that Mr. Sugar "wanted to make his October payment." But of course Mr. Dorman, taking into account the frailty of Mr. Sugar's understanding, could readily have pointed out that the October payment is made by the bookkeeper automatically in October, so there was no benefit whatever in postponing the date beyond October 31.[8] Since he admittedly did not point this out, we clearly have an issue under *Gediman*, even assuming, arguendo, that Mr. Dorman was not chargeable for failure to make a fuller disclosure concerning the advancement of the date to October 1.

---

7. Marvin Sugar testified that his father never discussed the retrement plan with him or with anyone else in his presence, (Sugar Dep. 19–20)—an answer he reiterated when appellee's counsel repeated the question on redirect. (Sugar Dep. 49). He never discussed his father's retirement plan with Wayne Dorman or anyone else prior to his father's death. (Sugar Dep. 20). His father never mentioned life expectancy at any time during the course of his illness, either to deponent or to doctors in deponent's presence. (Sugar Dep. 33). He was never present at any discussion between his father and nurses as to condition. (Sugar Dep. 38). On cross-examination by plaintiff he testified that he never had any discussion with his father as to the nature of his illness. (Sugar Dep. 56). He felt the doctors had tried to give his father some sense of hope, but he couldn't really testify as to any conference between the doctors and his father on the subject of the nature of his illness. (Sugar Dep. 62–63.)

8. The District Court noted that appellant has instructed her counsel to disclaim any contention that Mr. Sugar was not legally competent on October 1, and appellee emphasizes that Mr. Sugar himself had insurance experience. A man can obviously be legally competent and still lack the capability that marked the expertness he had in his prime. The obligation to speak out so as to take account of "frailties of human understanding," in Judge Friendly's phrase, surely comprehends an obligation to do more than rely on the former expertise of a man as sick as Mr. Sugar. Mr. Dorman was there to explain the matter in person, and he had a duty to handle this so as to alert Mr. Sugar. The trier of fact could also conclude that a general agent's knowledge of the mechanics of how and when payments are made from an agent's continuing account is greater than the sub-agent's. Mr. Dorman's duty to make things clear must also be related to his testimony, and that he could not swear whether Mr. Sugar was able to read at this time, and that he did not know the extent of Mr. Sugar's sedation.

Appellee could conceivably argue to the fact finder that Mr. Sugar had such a fixed notion, such an obsession, that he would have insisted on a two-week delay in retirement date, from October 31 to November 12, even when appropriately advised that he could establish all the benefits accruing to a 60-year old retiree with a payment made October 31. Such a conceivable but unlikely speculation is not to be enshrined into a judgment, in my view, without the verdict of a fact trier supported by substantial evidence. A court's inference on motion papers is inadequate.

7. Nor can appellee's exculpation be placed on the ground that its agent was not required to tell Mr. Sugar bleak facts of his condition or prognosis that the family did not want him to know. The fact trier might well conclude that no discussion of condition was required in order to suggest that retirement be effective as of the October payment rather than uselessly delayed two weeks. Furthermore Mr. Dorman's testimony proceeded on the line that he was able to talk to Mr. Sugar about his illness as a reason for advancing retirement date, and he nowhere states that he was told of, much less restricted in his conversation with Mr. Sugar because of, the family's restraint on discussion of illness. Appellee's brief proceeds on the premise that Mr. Sugar knew as much of his condition as did Mr. Dorman—a factual issue if ever I saw one.

8. The function of the trier of facts lies not only in resolving disputes as to the evidentiary facts, but also, even where the evidence is undisputed, in drawing inferences and applying normative standards, such as, whether the conduct described was "reasonable." Cf. Senko v. La Crosse Dredging Corp., 352 U.S. 370, 374, 77 S.Ct. 415, 417, 1 L.Ed. 2d 404 (1957), pointing out that the doctrine—

"that the determination of whether an injured person was a 'member of a crew' is to be left to the finder of fact meant that juries have the same discretion they have in finding negligence or any other fact."

It is for this reason, as well as the likelihood of disputes as to evidentiary facts, that negligence cases are said to illustrate "the type of issues that are not generally susceptible to summary adjudication." 6 Moore's Federal Practice § 56.15[8] (2d ed. 1966); see also §§ 56.17[1], 56.17[42]. They have long been identified as cases calling for a jury rather than a court even when the evidentiary facts are undisputed. O. W. Holmes, The Common Law 123 (1881).

Assuming, furthermore, that it is a court and not a jury that is to make the ultimate judgment, as in a "negligence" case that sounds essentially in breach of fiduciary duty, true accuracy of vision requires the depth and perspective of a trial.

Even where the central issue is of a kind labeled a question of "law," summary judgment is properly avoided if the field of law is in a state of flux, and its sound development turns on apprehension at trial of facts not established by documentary evidence. Cf., White Motor Co. v. United States, 372 U.S. 253, 259, 83 S.Ct. 696, 9 L.Ed.2d 738 (1963). Where the applicable legal principles turn on a rule of reason, application of the law is influenced by the shape of the facts as they emerge at trial and should not be molded in summary adjudications. These considerations are applicable here, where the duty owed by a company to its agent and assigns and beneficiaries turns on a blend of reasonableness and fiduciary relationships.

\*　\*　\*

In deciding whether or not to grant summary judgment, as in so many aspects of the art of judging, general principles are not decisive and disposition turns on the assessment of the particular case with its own factual stance. Certainly, however, the right of trial, a right that stands on constitutional grounds where a jury is involved, stands on a higher plane than such values as expedition, docket backlog, and the peace

of mind of litigants.[9] These values are important and they warrant pursuit— but with care, to avoid infringement of trial on the merits. To deny trial on the merits, a judge must have more than a conviction how the facts lie; he must be so clear both as to the facts and as to their ultimate significance, that he cannot visualize any lawful role for the fact finder that would result in a contrary conclusion.[10] The case before us does not meet that standard, in my view, and so I respectfully dissent.

---

9. There is a greater impetus to summary judgment when the mere pendency of the lawsuit casts a chilling restraint on the freedom of expression prized in our jurisprudence. Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965 (1966), cert. denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548 (1967).

10. A litigant who says he acted in all good faith but cannot dispel all the shadows by a clear-cut, illuminating and indisputable account of the transactions must go to trial. Dewey v. Clark, 86 U.S.App. D.C. 137, 180 F.2d 766 (1950).