Alfonso J. **CERVANTES**, Appellant,

v.

**TIME, INC., and Denny Walsh, Appellees.**

No. 71–1555.

United States Court of Appeals,
Eighth Circuit.

Submitted April 11, 1972.

Decided July 20, 1972.

Rehearing Denied Aug. 17, 1972.

Mortimer A. Rosecan, Rosecan & Popkin, St. Louis, Mo., for appellant.

Harold Medina, Jr., New York City, and D. Jeff Lance, Robert S. Allen, St. Louis, Mo., for appellees.

Before VAN OOSTERHOUT, Senior Circuit Judge, and MEHAFFY and STEPHENSON, Circuit Judges.

STEPHENSON, Circuit Judge.

Alfonso J. Cervantes is the mayor of Saint Louis, Missouri. In May 1970 there appeared in appellee's Life magazine an article of 87 paragraphs accusing the mayor of maintaining "business and personal ties with the gangsters that operate in his city." The article was entitled "The Mayor, The Mob and The Lawyer," and captioned with a comment explaining: "Both the mayor and his new crime commissioner have personal ties to the underworld." The substance of the article describes in some detail the relationship said to exist between Mayor Cervantes, Morris Shenker,[1] a Saint Louis criminal lawyer and then the mayor's appointee "to head [the] newly formed Commission on Crime and Law Enforcement," and Tony Sansone[2] who, according to the article, is "the mayor's liaison with the two mobs that run the St. Louis underworld."

Mayor Cervantes instituted this diversity libel action in the United States District Court for the Eastern District of Missouri seeking $2,000,000 compensatory and $10,000,000 punitive damages. He sought relief against and named as defendants the publisher of Life magazine and the reporter whose investigative efforts produced grist for the article.[3] He alleged in his amended complaint that 4 paragraphs of the article contained false statements which were authored, published, and communicated with knowledge of their falsity or, alternatively, with reckless disregard as to their truth.[4] The defendants answered raising both the defense of truth and constitutional privilege.

The mayor undertook extensive pre-trial discovery. He deposed the reporter who testified that he gathered information which formed the basis for most of the story from informants within the Federal Bureau of Investigation and within the United States Department of Justice. He revealed that these informants furnished him copies of confidential reports and orally transmitted additional and supplemental corroboratory information from which he constructed the events embodied in 3 of the 4 disputed paragraphs, but he refused, under repeated questioning, to divulge the names of the individuals from whom he

1. Mr. Shenker is characterized by the article as "the foremost lawyer for the mob in the U. S." "His relations with some of the nation's top hoodlums, Life's investigations show, go far beyond legal representation." The article describes Mr. Shenker as "a brilliant organizer of labyrinthine business and financial schemes which dazzle and befuddle the government," and as one who "would have to do little more than to tell what he already knows about organized crime to go a long way toward breaking its back in St. Louis and several other places as well."

2. Life has this to say about Mr. Sansone: "The man closest to Cervantes, as friend, business associate, campaign manager and unofficial but forceful influence around city hall, is Tony Sansone. A wealthy and socially prominent real estate and insurance man, Sansone is, to begin with, the son-in-law of Jimmy Michaels, a notorious gunman and gang leader whose record goes back to the shooting wars of the '20s in St. Louis. Michaels runs the Syrian Mob, an ethnic gang that coexists these days as an 'ally by treaty' with the Sicilian Mafia family in St. Louis headed by Anthony Giardano. Michaels' general franchise is the gambling and bookie operations in south St. Louis. He is also the most effective entrepreneur in either mob in politics and legitimate business."

3. The article was published under the reporter's by-line. The record reveals that although ultimate editorial responsibility for the article's content rested with Life's Associate and Managing editors, the reporter shared, with others, draftsmanship duties.

4. The mayor bases part of his action on the prepublication press release which Life dispatched to herald the coming of the article. The complaint charges that this release was transmitted by the publisher to radio and television stations

extracted this information. That refusal was bottomed on the theories (i) that to assume a contrary position would be to subject his informants to retaliation or reprisals and physical danger; (ii) that compulsory disclosure of confidential sources would violate the First Amendment's freedom of the press by impeding the dissemination of news which can be obtained only if he, as a professional journalist, may effectively guarantee anonymity of the source; and (iii) that he, as a professional journalist and as a resident and citizen of the State of New York, possesses a statutory reportorial privilege to withhold the source of news coming into his possession.[5] The mayor promptly moved for

throughout Missouri and elsewhere to stimulate reader interest. The release invited and authorized the media to announce that the forthcoming issue of Life would report that its years-long investigation disclosed, *inter alia*, that Mayor Cervantes has business and personal ties with the gangsters that operate in Saint Louis.

5. This aspect of the reporter's refusal is rooted in N.Y. Civil Rights Law, § 79–h (McKinney's Consol.Laws, c. 6, 1970). Subparagraph (b) of the statute provides, in substance, that a professional journalist shall not be adjudged in contempt by any court for "refusing or failing to disclose any news or the source of any such news coming into his possession in the course of gathering or obtaining news for publication or to be published in a * * * magazine * * * by which he is professionally employed or otherwise associated in a news gathering capacity." The law of Missouri recognizes no such privilege. We have been referred to no New York cases defining the scope of this statutory privilege. Nor have we found a New York case affording precedent from which we can determine whether the statute draws a distinction based on the context in which the privilege is asserted. But see People v. Wolf, 329 N.Y.S.2d 291 (Sup.Ct. New York County 1972), and In Re WBAI–FM, 326 N.Y. S.2d 434 (Albany County Ct.1971).

The scope of discovery permitted by Fed.Rules Civ.Proc. Rule 26(b) (1), 28 U.S.C.A. is limited to matters not privileged. This case presents the somewhat unusual situation where a deposition is being taken in New York for use in an action based on diversity of citizenship pending in a United States District Court sitting in Missouri, and the witness, a citizen of New York, claims a testimonial privilege not recognized in Missouri. In determining the validity of the asserted statutory privilege, a court is faced with the question whether to apply federal law or State law; and, if State law is to control, is it to be applied under the so-called *Erie* doctrine, see Erie Railroad Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938), or under Fed.Rules. Civ. Proc. Rule 43(a), providing, *inter alia*, that evidence shall be admitted if it is admissible under the rules of evidence in the courts of the State in which the federal court is situate? Once these questions have been resolved, the court must determine whether to apply the law of the trial State or that of the deposition State.

This court long ago adopted the rule, said to comport with the "weight of authority", see Massachusetts Mutual Life Insurance Company v. Brei, 311 F.2d 463, 465–466 (CA2 1962), that State, not federal, law is determinative of evidentiary problems arising in a diversity case. See, e. g., Bennett v. Wood, 271 F.2d 349, 351 (CA8 1959) (burden of proof); Severson v. Fleck, 251 F.2d 920, 923–924 (CA8 1958); and State Mutual Life Assurance Co. v. Wittenberg, 239 F.2d 87, 89–90 (CA8 1957) (burden of proof). Similarly, it is well-settled law that a federal diversity court must apply the choice-of-law rules of the State in which it sits, here Missouri. Klaxon Company v. Stentor Electric Manufacturing Co., Inc., 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). Applying these rules, we note that Missouri seemingly adheres to the generally accepted principle that the admissibility of evidence is governed by the law of the State where the testimony is to be heard. Rosser v. Standard Milling Company, Mo., 312 S.W.2d 106, 110 (1958), and Prentiss v. Illinois Life Ins. Co., Mo., 225 S.W. 695, 702 (1920). Thus, by this analysis, New York's law as to the testimonial privilege of a journalist does not apply, and the reporter is entitled to no protection on that ground. Compare Application of Cepeda, 233 F. Supp. 465 (S.D.N.Y.1964). The same result would follow under application of the proposed Rules of Evidence for the United States Courts and Magistrates, albeit for different reasons. See 51 F. R.D. 315, 356, 358–360.

an order to compel disclosure of the identity of the informant[s]. The defendants responded by moving for summary judgment on the ground that each had acted in good faith in publishing the article and that both believed all of the allegedly defamatory statements to be true.

The District Court (The Honorable James H. Meredith, Chief Judge), did not reach the merits of the motion to compel. However, on the basis of a well-developed record consisting of affidavits, depositions, and other documentary evidence, it entered summary judgment for the defendants on the grounds that neither defendant had knowledge of falsity, that neither entertained serious doubts as to the truth of any statement in the article, and that neither acted with reckless disregard for truth or falsity. 330 F.Supp. 936, 940 (1970). This appeal followed.

## I

█ In New York Times Co. v. Sullivan, 376 U.S. 254, 84 S.Ct. 710, 11 L. Ed.2d 686 (1964), it was established that the First and Fourteenth Amendments' protection of speech and the press restrict the enforcement of State libel laws. *Times* accordingly held that a public official may recover damages "for a defamatory falsehood relating to his official conduct" only if he "proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." *Id.*, at 279–280, 84 S.Ct. at 726. The holding of *Times* was reaffirmed and the reckless disregard aspect of its ac-

tual malice standard amplified in St. Amant v. Thompson, 390 U.S. 727, 88 S. Ct. 1323, 20 L.Ed.2d 262 (1968). The Court said with respect to this aspect of the constitutional standard:

"[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing. There must be sufficient evidence to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication. Publishing with such doubts shows reckless disregard for truth or falsity and demonstrates actual malice." 390 U. S., at 731, 88 S.Ct., at 1325.

It is clear, finally, that the conditional privilege granted by *Times* to false defamatory expression no longer is confined to statements concerning public officials. Rosenbloom v. Metromedia, Inc., 403 U.S. 29, 91 S.Ct. 1811, 29 L.Ed.2d 296 (1971), holds that constitutional protection is to be extended to "all discussion and communication involving matters of public or general concern, without regard to whether the persons involved are famous or anonymous." *Id.*, at 44, 91 S.Ct., at 1820. Thus, "the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of public or general concern." 403 U.S., at 44, 91 S.Ct., at 1820.

█ Since the statements in suit are conceded by all to touch and concern issues of public or general concern, it is clear that Mayor Cervantes cannot, absent a showing of actual malice, recover damages under the Missouri law of defamation.[6] The District Court con-

---

6. Various aspects of the Missouri law of defamation have received the careful attention of this court in previous cases. See, *e. g.*, Ruderer v. Meyer, 413 F.2d 175 (CA8 1969), certiorari denied 396 U.S. 936, 90 S.Ct. 280, 24 L.Ed.2d 235; Underwood v. Woods, 406 F.2d 910, 915 (CA8 1969); Walker v. Pulitzer Publishing Co., 394 F.2d 800 (CA8 1968); Pauling v. Globe-Democrat Publishing Co., 362 F.2d 188 (CA8 1966); certio-

rari denied 388 U.S. 909, 87 S.Ct. 2097, 18 L.Ed.2d 1347; and Riss v. Anderson, 304 F.2d 188 (CA8 1962). The Missouri law recognizes a qualified privilege in the news media to comment on matters and persons of public concern so long as the account is fair and not actuated by malice. See *e. g.*, Moritz v. Kansas City Star Co., 364 Mo. 32, 258 S.W.2d 583 (1953). This privilege is an affirmative defense which must be

cluded, and the defendants here suggest, that because substantial editorial effort was expended to secure independent corroboration of the published materials, the mayor cannot meet the applicable constitutional standard of proof.

## II

Without question the article fashions a broadside attack on the ability of Mayor Cervantes to perform responsibly in the governmental domain. It directs sharp and coarse comment both toward his official conduct and also his fitness for office. Indeed, the entire thrust of the article's message is that the mayor, despite public pronouncements to the contrary, seemingly possesses substantial personal and business interest in the perpetuation of profitable criminal activity in this city. Yet in the face of this massive attack on his fitness to occupy his important office, the mayor takes issue with but 4 of the 87 paragraphs comprising the article.[7] So far as the vast amount of the other material is concerned, its truth is either admitted or not explicitly denied. Thus, we are concerned here with only the comparatively few words said by the mayor to be false and defamatory, and as to these, he acknowledges that the burden is his to establish with "convincing clarity" deliberate or reckless error. *Times, supra,* 376 U.S. at 285–286, 84 S.Ct. 710, 11 L. Ed.2d 686.

Central to the mayor's appellate attack is his contention that he cannot possibly meet his burden of proof if the reporter is allowed to hide behind anonymous news sources. He argues that in a libel case of this kind the identity of a reporter's sources is absolutely essential to the successful outcome of the lawsuit. His arguments in favor of compulsory disclosure may be summarized as follows: [a] disclosure enables the plaintiff to scrutinize the accuracy and balance of the defendant's reporting and editorial processes; [b] through disclosure it is possible to derive an accurate and comprehensive understanding of the factual data forming the predicate for the news story in suit; [c] disclosure assists successful determination of the extent to which independent verification of the published materials was secured; and [d] disclosure is the sole means by which a libeled plaintiff can effectively test the credibility of the news source, thereby determining whether it can be said that the particular source is a perjurer, a well-known libeler, or a person of such character that, if called as a witness, any jury would likely conclude that a publisher relying on such a person's information does so with reckless disregard for truth or falsity. Moreover, these particularized considerations are said to assume extraordinary importance when, as in this case, the information forming the core of the publication by its nature is not available to the public generally and is obtainable only from governmental employees who are under a duty not to reveal it to outsiders.[8] On

---

proven by the defendant. Walker v. Kansas City Star Co., Mo., 406 S.W.2d 44 (1966). See also Pulliam v. Bond, Mo., 406 S.W.2d 635 (1966).

7. In his Reply Brief on this point the mayor asserts that most of the other material did not pertain to him. In the light of Mayor Cervantes' relationship with Commissioner Shenker, however, a fair reading of the record leaves us with the contrary inference.

8. The reporter freely admits and positively asserts that certain key information used in preparation of the article was "leaked" to him by anonymous governmental employees. The mayor contends that the reporter helped himself to confidential information from governmental files and, in so doing, incited a violation of regulations designated as "Prescribing Standards of Ethical Conduct for Government Officers and Employees," issued by President Johnson under authorization of 3 U.S.C.A. § 301. Exec.Order No. 11,222, 30 Fed.Reg. 6469 (1965) provides in pertinent part, that

"Section 101. Where government is based on the consent of the governed, every citizen is entitled to have complete confidence in the integrity of his government. Each individual officer,

the basis of these considerations, the mayor advanced arguments in the District Court that it should not reach the defense motion for summary judgment until he was given the opportunity to depose and examine the Federal Bureau of Investigation and Department of Justice employees who supplied Life's reporter with confidential reports and corroboratory materials used in connection with the article. The failure of the District Court to respond favorably to this plea is urged as error here.

These arguments in behalf of compulsory disclosure of confidential news sources, when urged on behalf of a public official whose reputation and integrity have been assaulted on the basis of information supplied by those sources, do not strike us as frivolous. Especially is this so when much of the information supplied by the anonymous informants

has been obtained from the private files of Government. Nevertheless, on the facts of this particular case, we believe that in his preoccupation with the identity of Life's news sources, the mayor has overlooked the central point involved in this appeal: that the depositions and other evidentiary materials comprising this record establish, without room for substantial argument, facts that entitled both defendants to judgment as a matter of law, *viz.*, that, quite apart from the tactics employed in collecting data for the article, the mayor has wholly failed to demonstrate with convincing clarity that either defendant acted with knowing or reckless disregard of the truth.

▆ We are aware of the prior cases holding that the First Amendment does not grant to reporters a testimonial privilege to withhold news sources.[9]

employee, or adviser of government must help to earn and must honor that trust by his own integrity and conduct in all official actions.

"Section 205. An employee shall not make use of, or permit others to make use of, for the purpose of furthering a private interest, official information not made available to the general public."

Purloined governmental documents have been before the courts before. See, *e. g.*, New York Times Co. v. United States, 403 U.S. 713, 91 S.Ct. 2140, 29 L.Ed.2d 822 (1971), and Dodd v. Pearson, 279 F.Supp. 101 (D. DC 1968). Compare Liberty Lobby, Inc. v. Pearson, 129 U.S. App.D.C. 74, 390 F.2d 489 (1968).

9. The weight of decisional authority so holds. See, *e. g.*, Garland v. Torre, 259 F.2d 545, 548–549 (CA2 1958), certiorari denied, 358 U.S. 910, 79 S.Ct. 237, 3 L.Ed.2d 231; State v. Buchanan, 250 Or. 244, 436 P.2d 729 (1968), certiorari denied, 392 U.S. 905, 88 S.Ct. 2055, 20 L.Ed.2d 1363; In re Taylor, 412 Pa. 32, 193 A.2d 181 (1963); and In re Goodfader, 45 Haw. 317, 367 P.2d 472 (1961). See also, Adams v. Associated Press, 46 F.R.D. 439, 440–441 (SD Tex.1969); Application of Cepeda, n. 5, supra; Brewster v. Boston Herald-Traveler Corp., 20 F.R.D. 416 (D.Mass.1957); and Rosenberg v. Carroll (In re Lyons), 99 F.Supp. 629 (SD N.Y.1951). But see

In re Grand Jury Witnesses, 322 F. Supp. 573, 576–578 (ND Cal.1970).

In two recent cases, however, it has been held that a libel defendant's refusal to reveal the identity of its news sources need not bar the entry of summary judgment in its favor. Konigsberg v. Time, Inc., 312 F.Supp. 848 (SD N.Y. 1970), and Cerrito v. Time, Inc., 302 F.Supp. 1071 (ND Cal.1969), aff'd per curiam, 449 F.2d 306 (CA9 1971). Implicit in each of these cases is tacit approval of the contention that the free flow of news obtainable only from anonymous sources is likely to be deterred absent complete confidentiality. Hence, each court seemed to reason that, absent a positive showing of relevance or materiality, a newsman need not divulge the identity of his confidential news informants.

Finally, in Branzburg v. United States, 408 U.S. 665, 92 S.Ct. 2646, 33 L.Ed.2d 626 (Caldwell v. United States) (1972), the Supreme Court was asked to address the constitutional aspects of grand jury efforts to acquire from professional journalists information about possible law violations committed by their news sources. See Caldwell v. United States, 434 F.2d 1081 (CA9 1970), certiorari granted, 402 U.S. 942, 91 S.Ct. 1616, 29 L.Ed.2d 109; In re Pappas, 226 N.E.2d 297 (Mass.1971), certiorari granted, *ibid*; and Branzburg v. Pound, 461 S.W.2d 345 (Ky.Ct.App.1970), certiorari granted,

But to routinely grant motions seeking compulsory disclosure of anonymous news sources without first inquiring into the substance of a libel allegation would utterly emasculate the fundamental principles that underlay the line of cases articulating the constitutional restrictions to be engrafted upon the enforcement of State libel laws.[10] Such a course would also overlook the basic philosophy at the heart of the summary judgment doctrine.

### III

■ Some twenty years ago, this court, in Traylor v. Black, Sivalls & Bryson, Inc., 189 F.2d 213 (CA8 1951), set forth the general policy of the circuit with regard to the entry of summary judgment. There it was said that:

"A summary judgment upon motion therefor by a defendant in an action should never be entered except where the defendant is entitled to its allowance beyond all doubt. To warrant its entry the facts conceded by the plaintiff, or demonstrated beyond reasonable question to exist, should show the right of the defendant to a judgment with such clarity as to leave no room for controversy, and they should show affirmatively that the plaintiff would not be entitled to recover under any discernible circumstances." 189 F.2d, at 216. (Citations omitted).

Summary judgment, as the foregoing excerpt makes clear, is an extreme remedy to be granted only in those cases where there clearly is no genuine issue to be tried. But its extreme nature does not lighten the burden of a party against whom a motion therefor is interposed. Indeed, Fed.Rules Civ.Proc. Rule 56(e), 28 U.S.C.A., supplies the other side of the proposition recognized in *Black, Sivalls & Bryson.* In pertinent part, it is therein stated:

"When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If he does not so respond, summary judgment, if appropriate, shall be entered against him."

This aspect of Rule 56(e) has been followed in prior decisions of this court, both in summary judgment cases generally, Lundeen v. Cordner, 354 F.2d 401, 407–408 (CA8 1966), and in First Amendment libel cases in particular, Hurley v. Northwest Publications, Inc., 398 F.2d 346 (CA8 1968), aff'g per curiam, 273 F.Supp. 967, 974–975 (D.Minn. 1967). It accords with recent constructions of Rule 56(e) by the Supreme Court, Adickes v. S. H. Kress & Company, 398 U.S. 144, 153, 160–161, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970), and First National Bank of Arizona v. Cities Serv-

---

*ibid.* It was held, over 4 dissents, that a newsman does not possess a First Amendment privilege to refuse to answer relevant and material questions asked during a good-faith grand jury investigation. Noting that "the First Amendment does not invalidate every incidental burdening of the press that may result from the enforcement of civil or criminal statutes of general applicability," 408 U.S. at 682, 92 S.Ct. at 2657, the Court declined to exempt newsmen from the general obligation of all citizens "to answer questions relevant to an investigation into the commission of crime." *Ibid.* The Court was not faced with and, therefore, did not ad-

dress, the question whether a civil libel suit should command the quite different reconciliation of conflicting interests pressed upon us here by the defense.

10. Indeed, as the Court observed in *Caldwell*, n. 9, *supra*, "without some protection for seeking out the news, freedom of the press could be eviscerated." 406 U.S. at 681, 92 S.Ct., at 2656. Similarly, to compel a newsman to breach a confidential relationship merely because a libel suit has been filed against him would seem inevitably to lead to an excessive restraint on the scope of legitimate news-gathering activity.

ice Co., 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968), and it advances the important summary judgment objective of judicially assessing the proof to see where there is a genuine issue for trial.

 Applying these rules to the case before us, the compulsory disclosure issue is drawn into clearer focus. Where there is a concrete demonstration that the identity of defense news sources will lead to persuasive evidence on the issue of malice, a District Court should not reach the merits of a defense motion for summary judgment until and unless the plaintiff is first given a meaningful opportunity to cross-examine those sources, whether they be anonymous or known. For only then can it be said that no genuine issue remains to be tried. Thus, if, in the course of pretrial discovery, an allegedly libeled plaintiff uncovers substantial evidence tending to show that the defendant's published assertions are so inherently improbable that there are strong reasons to doubt the veracity of the defense informant or the accuracy of his reports, the reasons favoring compulsory disclosure in advance of a ruling on the summary judgment motion should become more compelling. Similarly, where pretrial discovery produces some factor which would support the conclusion that the defendant in fact entertained serious doubt as to the truth of the matters published, identification and examination of defense news sources seemingly would be in order, and traditional summary judgment doctrine would command pursuit of further discovery prior to adjudication of a summary judgment motion. The point of principal importance is that there must be a showing of cognizable prejudice before the failure to permit examination of anonymous news

sources can rise to the level of error. Mere speculation or conjecture about the fruits of such examination simply will not suffice. *Hurley, supra,* p. 974 of 273 F.Supp.

 But such is not this case. As the opinion of the District Court makes clear, the record contains substantial evidence indicating that it was over a period of many months that Life's reporter carefully collected and documented the data on the basis of which the article was written and published. In turn, Life's key personnel, including one researcher, four editors and three lawyers, spent countless hours corroborating and evaluating this data. Once suit was instituted, the mayor was provided with hundreds of documents utilized in preparation of the article. He then deposed virtually every Life employee who possessed any connection whatever with the article's preparation and publication and, with one exception, each affirmed his or her belief in the truth of the article and each gave deposition testimony sufficient to raise a strong inference that there was good reason for that belief.[11] To rebut this evidence, and to support his claim that 4 of the 87 paragraphs conveyed false information, the mayor was content to present little more than a series of self-serving affidavits from himself and from Mr. Sansone, together with other evidentiary materials which framed but a minimal assault on the truth of the matters contained in the four paragraphs. Aside from this evidence, he has not produced a scintilla of proof supportive of a finding that either defendant in fact entertained serious doubts about the truth of a single sentence in the article. Neither has he come forward with competent evidence from which the District Court could reasonably discern the inherent improbabil-

---

11. The single exception is this: one of Life's house counsel testified only that he had authenticated the genuineness of certain Government documents which had come into the possession of Life's re-

porter. He did not purport to pass on the truth or falsity of these purloined materials. This same employee formerly had served as Chief of the Department of Justice's Organized Crime section.

ity of the matters published. In short, the mayor's proof simply does not meet the standard traditionally required of one against whom a motion for summary judgment is interposed.

We have mentioned long-standing decisions of the Supreme Court making clear that the mayor is obligated to demonstrate with convincing clarity that the materials he alleges to be defamatory were published with knowledge of their falsity or with reckless disregard for their truth.. Where, as here, the published materials, objectively considered in the light of all the evidence, must be taken as having been published in good faith, without actual malice and on the basis of careful verification efforts, that is, they were published in good faith without regard to the identity of the news sources, there is no rule of law or policy consideration of which we are aware that counsels compulsory revelation of news sources.[12] Neither is there any evidence by which a jury could reasonably find liability under the constitutionally required instructions. When these factors conjoin, the proper disposition is to grant the defense motion for summary judgment.[13] The judgment of the District Court must therefore be affirmed.[14]

Affirmed.

12. *Caldwell* makes clear that harassment of the press undertaken not for legitimate reasons is without justification. 408 U.S. 665, 92 S.Ct. 2646 (opinion of Powell, J.). To compel disclosure under the circumstances shown by this record would seem to constitute precisely the harassment *Caldwell* seeks to curb.

13. Cf. Thompson v. Evening Star Newspaper, 129 U.S.App.D.C. 299, 394 F.2d 774, 776 (1968), certiorari denied, 393 U.S. 884, 89 S.Ct. 194, 21 L.Ed.2d 160; Markus v. Penn Mutual Life Insurance Co., 128 U.S.App.D.C. 368, 389 F.2d 538, 545, n. 9 (1967); and Washington Post Co. v. Keogh, 125 U.S.App.D.C. 32, 365 F.2d 965, 968 (1966), certiorari denied, 385 U.S. 1011, 87 S.Ct. 708, 17 L.Ed.2d 548.

14. The result we reach in the instant case is not to be construed as precedent for the proposition that news reporters are free to roam at will through the private papers of Government in search of a news story. We hasten to emphasize that through enactment of the Freedom of Information Act, 5 U.S.C. § 552 (1970), amending 5 U.S.C. § 1002 (1964), the Congress has attempted to strike the proper balance between the public's "right to know" and the Government's need for secrecy. We note this Act provides that all Government files are to be made available by publication, or otherwise, unless expressly excepted by one of nine carefully delineated exceptions. As to the exceptions, see § 552(a) (4), (b) (5), (b) (7).