**NATIONAL LABOR RELATIONS BOARD, Applicant,**

**v.**

**Chris MORTENSEN, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Applicant,**

**v.**

**Christine BRENNAN and Michael Wilbon, Respondents.**

**Misc. Nos. 88–311, 88–320.**

United States District Court, District of Columbia.

Nov. 23, 1988.

---

Nelson A. Levin, N.L.R.B., Region 5, Baltimore, Md., for applicant.

Mark A. Srere, Williams & Connolly, R. Bruce Beckner, Michael P. Fisher, Dow, Lohnes & Albertson, Washington, D.C., for respondents.

## MEMORANDUM OPINION

BARRINGTON D. PARKER, Senior District Judge:

The General Counsel of the National Labor Relations Board ("NLRB" or "Board") seeks enforcement orders from this Court requiring three newspaper reporters to comply with certain regularly issued subpoenas *ad testificandum.* The subpoenas were duly served on the reporter-respondents, Chris Mortensen of *The Atlanta Journal–Constitution,* and Christine Brennan and Michael Wilbon of *The Washington Post.* Their counsel challenge the General Counsel's application and contend that entry of enforcement orders covering the subpoenas would violate a reporter's privilege under the First Amendment.

The matter presents a serious constitutional question of whether enforcing the subpoenas would infringe upon the respondents' qualified privilege and chill their ability to gather news. In deciding the issue, the Court must strike a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony.

The background facts, the applicable law and the arguments of counsel have been fully considered. For the reasons stated below the Court determines that under the circumstances presented, the challenge of the respondents should be rejected. The Court will enter an appropriate enforcement order which shall limit the questions that may be asked of the respondents.

## I.

## BACKGROUND

The underlying events before the National Labor Relations Board giving rise to this subpoena enforcement action involve the National Football League Players Association, AFL–CIO ("Players Association") and the National Football League Management Council ("Management Council"). Included within the latter as constituent members, are the 28 football teams within the League.

On the eve of the 1987 National Football League season, the Players Association called a strike. That labor action was short-lived and, according to the Players Association, was seriously undermined by the "anti-union" activities of the Management Council. On basis of charges made by the Players Association, the Management Council and its constituent members were charged with interference, deprivation of players' guaranteed rights, and unfair labor practices—alleged violations of Sections 7 and 8(a)(1) of the National Labor

Relations Act, 29 U.S.C. §§ 151 *et seq.* (1975).

The reporter-respondents were served with subpoenas *ad testificandum,* in order to authenticate certain statements made by and/or attributed to John Jones, Bobby Beathard and Jim Conway, all serving as members of the Management Council. Jones and Conway were Public Relations Director and General Counsel, respectively; Beathard was General Manager of the Washington Redskins. The statements attributed to the three were made in separate press interviews with the reporter-respondents during the 1987 strike and, if true, are relevant to the charges—deprivation of players' guaranteed rights and unfair labor practices.

The respondents' news articles quoted or paraphrased statements attributed to three members of the Management Council. Specifically, respondent Chris Mortensen wrote an article published on October 9, 1987, in *The Atlanta Journal–Constitution* entitled "Players Union Accused of 'Outright Lying' to its Strikers." Two consecutive paragraphs of the article for which authentication is sought read:

Jones also sent a message to striking players: Though the 1 p.m. deadline to play in Sunday's games has passed, they can still report and expect their paychecks.

'The games are going to be played, but it's almost impossible that they would be played by the guys on strike,' said Jones. 'Unless we had a dead agreement on all the issues, there's no way those players could expect to play. And I can assure you we are not close on an agreement.'

Respondents Christine Brennan and Michael Wilbon wrote articles that appeared on October 15, 1987, in *The Washington Post.* The Brennan article included a quote from Bobby Beathard of the Washington Redskins. The Wilbon article paraphrased a statement attributed to the chief attorney for the Management Council.

Ms. Brennan's article read in part:

'I was told that if [Management Council executive director Jack Donlan and Upshaw] had reached an agreement [Wednesday], the deadline would be extended. But if the players came in and there was no agreement, there was no possibility they could play,' Beathard said.

Mr. Wilbon's article included, *inter alia,* the following paragraph:

In New York, Jim Conway, general counsel of the Management Council, said his office expected 'a couple other teams' to return as full groups today and that as many as seven other teams may do so. None will be eligible to play this week unless the strike is over, he said.

Jones, Beathard, and Conway appeared as witnesses at the NLRB hearings. When confronted with the newspaper articles, none admitted the statements attributed to them. Jones denied making the statement quoted by Mortensen, Beathard would neither confirm nor deny the statement attributed to him by Brennan, and Conway denied the statement ascribed to him by Wilbon.

Faced with the answers of the three members of the Management Council, the Administrative Law Judge ("ALJ") conducting the hearing, caused subpoenas to be issued against the reporters. The subpoenas required the journalists to appear and verify the fact that they had conducted and reported correctly the three interviews. The respondents' several challenges to the subpoenas were denied at the Board level. Faced with this problem, the General Counsel for the Board applied for judicial relief, an order from this Court directing Mortensen, Brennan, and Wilbon, to appear before the ALJ and give testimony as to the accuracy of the statements attributed to the three Management Council personnel.

On November 7, 1987, counsel for the respondents appeared before the Court and offered argument on behalf of their clients. Counsel for the Players Association and the Management Council also appeared. They presented argument on their recently filed motions to intervene which were taken under advisement. An order denying the motions to intervene was entered on November 22, 1988.

## II.

### ANALYSIS

Respondents contend that this Court should deny the application for orders enforcing the subpoenas *ad testificandum,* because such orders would clearly violate First Amendment guarantees of freedom of the press. They also contend that as journalists they are constitutionally protected from compelled disclosure of their news gathering activities by virtue of the "reporter's privilege." In responding, the Board counters that the constitutional issues should not be addressed since it is only seeking verification of quotations which would not result in an intrusion upon the reporters' First Amendment privileges. In the alternative, the Board argues that under the reporters' privilege balancing test, the weight of the considerations favors requiring the reporters to testify.

### A.

The Supreme Court explicitly acknowledged the existence of First Amendment protection for news gathering in *Branzburg v. Hayes,* 408 U.S. 665, 681, 707, 92 S.Ct. 2646, 2656, 2669, 33 L.Ed.2d 626 (1972). The Court held, however, that a journalist does not have an absolute privilege under the First Amendment to refuse to disclose confidential sources to a grand jury conducting a criminal investigation, despite the potential interference with news gathering. Justice Powell, who cast the deciding vote, wrote a concurring opinion in which he stated that courts can determine whether a privilege applies by using a balancing test:

> The asserted claim to privilege should be judged on its facts by the striking of a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct. The balance of these vital constitutional and societal interests on a case-by-case basis accords with the tried and traditional way of adjudicating such questions.

*Id.* at 710, 92 S.Ct. at 2671.

This Circuit has stated that a qualified reporter's privilege under the First Amendment should be readily available in civil cases. *Zerilli v. Smith,* 656 F.2d 705, 711 (D.C.Cir.1981) (citing *Carey v. Hume,* 492 F.2d 631, 636 (D.C.Cir.), *cert. dismissed,* 417 U.S. 938, 94 S.Ct. 2654, 41 L.Ed.2d 661 (1974)). Other circuits considering the question have agreed that a balancing approach should be applied to civil as well criminal cases. *See Riley v. City of Chester,* 612 F.2d 708, 715–16 (3rd Cir.1979); *Silkwood v. Kerr–McGee Corp.,* 563 F.2d 433, 436–38 (10th Cir.1977); *Baker v. F & F Investment,* 470 F.2d 778, 783 (2d Cir. 1972), *cert. denied,* 411 U.S. 966, 93 S.Ct. 2147, 36 L.Ed.2d 686 (1973); *Cervantes v. Time, Inc.,* 464 F.2d 986 (8th Cir.1972), *cert. denied,* 409 U.S. 1125, 93 S.Ct. 939, 35 L.Ed.2d 257 (1973).

█ As a preliminary matter, the Court rejects the notion that the subpoenas do not implicate cognizable First Amendment interests. The Board seeks confirmation that certain sources spoke to the reporters and gave statements regarding the strikers' deadline. Their contention that this discovery is beyond First Amendment concern because it does not seek to identify confidential sources is a misconception of the scope of the free press interest. Regardless of whether they seek confidential or nonconfidential sources, or whether they seek disclosure or verification of statements, the Board is attempting to examine the reportorial and editorial processes. The fact that their purpose is to support, rather than undermine, the bona fides of the statements as expressed by the reporters makes no difference. Such discovery necessarily implicates the First Amendment interests of the journalists. *See Application of Consumers Union of United States, Inc.,* 495 F.Supp. 582, 586 (S.D.N.Y. 1980). Under the circumstances presented, therefore, the Court is required to apply the *Branzburg* balancing test and consider the conflicting interests at issue in this case.

### B.

Several courts have set forth precise guidelines to determine how the balance

should be struck in a particular case. In *United States v. Criden*, 633 F.2d 346 (3d Cir.1980), *cert. denied*, 449 U.S. 1113, 101 S.Ct. 924, 66 L.Ed.2d 842 (1981), the Third Circuit stated that a reporter's privilege can be overcome by satisfying the following three-part balancing test:

> First, the movant [seeking to override the privilege] must demonstrate that he has made an effort to obtain the information from other sources. Second, he must demonstrate that the only access to the information sought is through the journalist and her source. Finally, the movant must persuade the court that the information sought is crucial to the claim.

*Id.* at 358–59.

■ A court must be sensitive to the availability of alternative means by which a litigant might acquire the same information without intruding upon a journalist's protected activities. If it is clear that there are alternative means of obtaining the information the movant seeks, the subpoenaed reporter will not be compelled to testify or produce materials. *Maughan v. NL Industries*, 524 F.Supp. 93, 95 (D.D.C. 1981). The importance of protecting journalists' sources certainly points towards compelled disclosure from the newsperson as normally the end, and not the beginning, of the inquiry. *Carey*, 492 F.2d at 638. Our Circuit has recently declared that "reporters should be compelled to disclose their sources only after the litigant has shown that he has exhausted every reasonable alternative source of information." *Zerilli*, 656 F.2d at 713. But where the journalist appears to be the only one with access to information relevant to the case, courts are willing to compel disclosure. *Carey*, 492 F.2d at 639 (litigants must not be "made to carry wide-ranging and onerous discovery burdens where the path is [ ] ill-lighted....")

Movant must also show that the reporters are the only keepers of the information the movant seeks. *Riley*, 612 F.2d at 717. The party seeking the information must show "that his only practical access to crucial information necessary for the development of the case is through the newsman's sources." *Gilbert v. Allied Chemical Corp.*, 411 F.Supp. 505, 510 (E.D.Va.1976) Journalists are often the only ones able to testify that certain statements were ever made, and the speaker's motivation in disclosing certain information to a reporter may be very important to a case. Courts have recognized that in some cases, a journalist's recollection of remarks within the context of the conversation is valuable information that the movant could not acquire from any other source. *Criden*, 633 F.2d at 359. When movants clearly have no other source from which they can gain this insight, the journalist may be compelled to testify.

The third factor that must be considered is whether the information is of central importance and goes to the "heart" of the matter. *Carey*, 492 F.2d at 636. In *Carey*, a newspaper reporter was charged with libel based on his column reporting that plaintiff had removed documents and later complained to police that the documents had been stolen. This Circuit upheld the district court which directed the journalist to reveal the names of eyewitnesses to the alleged removal. Because the record did not disclose a thorough investigative effort by the reporter, the court stated that the sources' identities and their reliability were "critical" to plaintiff's claim that the reporter had acted recklessly. *Id.* at 637. *See also, Miller v. Transamerican Press, Inc.*, 621 F.2d 721, 726 (5th Cir.1980), *cert. denied*, 450 U.S. 1041, 101 S.Ct. 1759, 68 L.Ed.2d 238 (1981) (because the only source for allegedly libelous comments was the informant, disclosure of the informant's identity was compelled).

Before requiring a journalist to testify, courts have examined whether the litigant seeks discovery of a confidential or nonconfidential source. Many conclude that a lesser showing of need and materiality is required for discovery of nonconfidential material than for the identity of confidential sources. *See Bruno & Stillman, Inc. v. Globe Newspaper Co.*, 633 F.2d 583, 597 (1st Cir.1980) ("the court must assess the extent to which there is a need for confidentiality. Not all information is equally

deserving of confidentiality."); *United States v. Cuthbertson*, 630 F.2d 139, 147 (3rd Cir.1980), *cert. denied*, 449 U.S. 1126, 101 S.Ct. 945, 67 L.Ed.2d 113 (1981) ("Of course, the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production in a particular case."); *Continental Cablevision Inc., v. Storer Broadcasting Co.*, 583 F.Supp. 427, 434 (1984) (discovery of nonconfidential materials may not be entitled to the same protection as discovery of the identity of confidential informants).

As the Supreme Court instructed in *Branzburg*, 408 U.S. at 710, 92 S.Ct. at 2671, the balance of interest depends on the facts of each case. Because the privilege is qualified, countervailing interests may prevail in a particular case. *Riley*, 612 F.2d at 715.

## C.

■ Applying the guidelines to the facts of this case, the Court is convinced that the reporters' qualified privilege must yield to the NLRB's need to verify the statements. The Board has met its burden under the test for compelling journalists' testimony. It has attempted to obtain relevant information elsewhere. The General Counsel subpoenaed Jones, Beathard, and Conway as witnesses and asked about the statements attributed to them. Having called the three Management Council members involved, and having noted the unresolved questions regarding their testimony, the Board must turn to the keepers of the information themselves, the reporters who actually wrote the statements and conducted the interviews. The reporters are the direct and the most logical source of information about the statements of the three men because they were the other participants in the conversations from which the statements were taken. As the NLRB held in *Valley Camp Coal Co.*, 265 NLRB 1683 (1982) when the identity of the source was openly acknowledged and the evidence was clearly relevant, "counsel for the General Counsel is entitled to elicit from Petitioner [journalist] testimony with respect to

[speaker's] statements explaining his decision" at issue in the unfair labor action proceeding. *Id.* at 1684.

The NLRB has fulfilled its obligation to exhaust possible alternative sources of information. The declaration filed by Harvey A. Holzman, counsel in the underlying unfair labor practice proceeding, identified the numerous individuals who appeared before the ALJ. (Declaration of Harvey A. Holzman, NLRB co-counsel, at 3 (November 8, 1988)). The top officials of the Management Council denied that the strikers deadline rule could be waived, which is inconsistent with the statements attributed to Jones, Beathard, and Conway by the reporters in their October 1987 stories. Conway and Jones denied that they told reporters that the deadline could be waived. According to Holzman, one of Jones' duties was to get information to the news media. Yet, neither Conway, nor Jones could specifically recall being interviewed by Wilbon or Mortensen, respectively. As a result, the NLRB's General Counsel was unable to ascertain whether anyone else was present during the interviews. *Id.* Since the management individuals are now denying that they ever made such contrary and conflicting statements to the journalists, the reporters' testimony is very important.

The General Counsel has also tried alternative methods of demonstrating that management's reporting deadline rule was discriminatory by requesting that the Management Council produce all documents pertaining to the deadline rule, including the waiver or changing of that rule. *Id.* at 3–4. But the Management Council and the 28 member clubs have asserted that they have provided all documents covered by the General Counsel's subpoenas *duces tecum*. According to Holzman's declaration, all subpoenaed documents have been reviewed and nothing has been found that deals with the possibility of waiving the deadline for returning strikers. *Id.* at 4. Clearly, the General Counsel has exhausted all possible sources and the reporters remain the only individuals with the knowledge of whether these management

officials made statements about the waiver of the reporting deadline.

The final criterion to be applied is the relevance and importance of the matter to the particular proceeding. The statements attributed to three Management Council members are central to the Board's allegation that the deadline was just a pretext and that the Management Council discriminated against striking players. Without the authentication of the statements the Board will not have a fair opportunity to prove that the Management Council engaged in unfair labor activities.

The fact that the three important management personnel have denied or refused to confirm their quoted statements, distinguishes this case from *Maughan v. NL Industries*, 524 F.Supp. 93 (D.D.C. 1981). There the court held the need for the reporter's testimony was not compelling and alternative sources existed. In *Maughan*, the plaintiffs did not deny making the statements that appeared in the article and therefore the movant could attempt to obtain the information it needed by way of stipulation or requests for admissions. *Id.* at 95. Here, Jones, Beathard, and Conway testified before the ALJ, yet no one confirmed the remarks quoted by respondents. The reporters' interests in refusing to testify for the sole purpose of verifying the statements, not disclosing sources, is rather attenuated and must yield to the need for confirmation as presented here.

In applying the balancing test to the specific facts of this case and weighing the conflicting interests, the Court has little if any doubt in ruling that the respondents must testify regarding the statements they quoted or paraphrased in their October 1987 articles.

## CONCLUSION

In balancing the NLRB's right to compel discovery against the assertions that discovery will intrude upon protected First Amendment rights of journalists, the Court concludes that the Board's need for discovery outweighs any possible intrusion on the news gathering process. The public interest in requiring citizens to give relevant testimony in civil proceedings takes precedence over the interests of the reporters asserted in this case. In requiring the reporters to testify at the ongoing hearings pending before the NLRB, the Court is sensitive to the Supreme Court's warning that intrusions upon First Amendment activities must be narrowly limited. Therefore, the Court will limit the questions posed to the reporters.